Ex. H

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| VISTEON GLOBAL TECHNOLOGIES, INC. AND VISTEON TECHNOLOGIES, LLC<br><br>Plaintiffs,<br><br>v.<br><br>GARMIN INTERNATIONAL, INC.<br><br>Defendant. | Case No. 2:10-cv-10578--PDB-DRG |

| | |
|---|---|
| Michael J. Huget<br>Deborah J. Swedlow<br>Honigman Miller Schwartz and Cohn LLP<br>130 S. First Street, Fourth Floor<br>Ann Arbor, MI 48104<br>(734) 418-4200<br><br>Eric A. Buresh<br>Adam P. Seitz<br>Jason R. Mudd<br>Paul R. Hart<br>Erise IP, P.A.<br>6201 College Boulevard, Suite 300<br>Overland Park, Kansas 66211<br>(913) 777-5600<br>*Attorneys for Defendant* | Scott A. Wolfson<br>Wolfson Bolton PLLC<br>3150 Livernois, Suite 275<br>Troy, MI 48083<br>(248) 247-7103<br><br>Richard M. McDermott<br>Jitendra Malik<br>Alston & Bird LLP<br>Bank of America Plaza<br>101 South Tryon Street, Suite 4000<br>Charlotte, NC 28280-4000<br>(704) 444-1000<br>*Attorneys for Plaintiffs* |

## **DECLARATION OF MICHAEL B. MAZIS, PH.D.**

I, Michael B. Mazis, having personal knowledge of the facts stated below, and under penalty of perjury of the laws of the United States, hereby declare that:

1. I make this declaration at the request of counsel for Garmin International, Inc. ("Garmin") and, if called to testify at a hearing as to the content of this declaration, I would testify competently thereto.

2. This Declaration is submitted in support of Garmin's Motion to Exclude Dr. Joel Steckel's Conjoint Survey and Conclusions Derived Therefrom.

**Background**

3. I am Professor Emeritus of Marketing at American University's Kogod School of Business. I was a faculty member at American University for 28 years, and I served over 10 years as chair of the marketing department. I have taught courses in consumer behavior and marketing research to undergraduate and graduate students.

4. I received my B.S. degree in Economics from the University of Pennsylvania, my M.B.A. degree from New York University, and my Ph.D. degree in Business Administration from Pennsylvania State University. I was editor of the Journal of Public Policy & Marketing from 1992 to 1995, and I was Associate Editor of The Journal of Consumer Affairs from 1998 to 2001.

5. My research interests have focused on consumer perception of advertising, labeling, and other marketing materials and on the impact of information disclosures on consumer perceptions. I have published over 60 articles in academic journals, including Journal of Marketing, Journal of Consumer Research, Journal of Marketing Research, Journal of Public Policy & Marketing, The Journal of Consumer Affairs, Journal of Personality and Social Psychology, Journal of Experimental Social Psychology, and Journal of the American Medical Association.

6. From 1976-79, I served as an in-house marketing expert at the Food and Drug Administration (FDA) and at the Federal Trade Commission (FTC), where I evaluated consumer perception of advertising and product labels and designed and conducted marketing research surveys, which included the evaluation of consumer reaction to various types of information. I have been a consultant for the FTC, having served as the FTC's principal marketing witness in FTC vs. Novartis in 1997, FTC vs. Trans Union in 1998, FTC vs. Mercury Marketing in 2003, FTC vs. Telebrands in 2004, and FTC vs. POM Wonderful in 2011.

7. In addition, I have served as a consultant on marketing issues for the FDA, Consumer Product Safety Commission, Department of Justice, Federal Deposit Insurance Corporation, Bureau of Tobacco, Alcohol, and Firearms, U.S. Mint, and the states of California and Vermont.

8. I have prepared and submitted two expert reports in this matter, the first on October 26, 2012 and a second on December 24, 2012. Each of these reports includes additional details on (1) my background, (2) my analyses and conclusions in this matter, and (3) the materials I have reviewed in reaching these conclusions. I fully adopt the analyses and opinions in both reports and if called to testify at a hearing as to the content of either report, I would testify competently thereto.

9. Since my December 24, 2012 Supplemental Report, I have additionally considered the transcript of Dr. Steckel's deposition held on January 16, 2013.

**Unbounded Median of Dr. Steckel's Economic Values**

10. As I described in my Supplemental Expert Report served on December 24, 2012, Dr. Steckel constrained the raw data produced by his conjoint survey in two ways for purposes of calculating Economic Values in his Revised Report.  Supplemental Mazis Report at ¶¶ 15-16.  First, Dr. Steckel changed Economic Values to zero (0) for any respondent who expressed a preference for a non-infringing alternative to the patented technology.  Second, Dr. Steckel capped Economic Values at $20 for respondents who attributed a value greater than $20 for a given patented feature.

11. For my Supplemental Expert Report, I analyzed the unbounded data produced by Dr. Steckel's survey in order to assess the impact of his two data constraints.  This review made clear that Dr. Steckel's data manipulation acutely impacted his Economic Values.  Specifically, the '375 patent feature Economic Value increased from $11.86 to $435.36, the '408 patent feature Economic Value increased from $13.93 to $506.76, the '060 patent feature Economic Value increased from $14.48 to $568.73, and the '892 patent feature Economic Value increased from $10.41 to $291.74.  Supplemental Mazis Report at ¶ 25.

12. I understand that, after my Supplemental Expert Report was served, Dr. Steckel criticized my Economic Value calculations based on his unbounded survey data and suggested that median values, not mean values, should be calculated if the data constraints were removed.  Steckel 1/16/2013 Depo. at 367:12-369:14.  Dr. Steckel further suggested that calculating median values from the unbounded data should

> produce similar results to his mean values calculated from the bounded data. *Id*. at 311:25-312:4 and 369:3-370:3.

13. I performed the suggested median Economic Value calculations using Dr. Steckel's unbounded data as he suggested, and the results far exceed the mean Economic Values calculated from his bounded data. Specifically, the '375 patent feature median Economic Value is $13.46, the '408 patent feature median Economic Value is $25.32, the '060 patent median Economic Value is $41.51, and the '892 patent median Economic Value is $6.75. These calculations were reported in my Worksheet 23, which is Bates numbered GARMV-02-00033319 (attached as Ex. A). The sum of these four values, $87.04, would represent 72.5% of the price of the entire product based on Dr. Steckel's assumed $119.99 average navigation device sale price for his conjoint survey.

**Percent of Respondents Whose Responses Were Capped By Dr. Steckel's $20 Cut-Off**

14. In addition to quantifying the differences in Economic Values that result from removing Dr. Steckel's data constraints, I determined how many respondents had their responses capped by Dr. Steckel's $20 cap. These calculations were reported in my Worksheet 22, which is Bates numbered GARMV-02-00033318 (attached as Ex. A). The results are startling—approximately half of all respondents had their valuations manipulated through Dr. Steckel's constraint. Specifically, 57.9% of respondents had their '408 patent feature valuations capped by Dr. Steckel, 48.9% of respondents had their '375 patent feature valuations capped by Dr. Steckel,

61.9% of respondents had their '060 patent feature valuations capped by Dr. Steckel, and 39% of respondents had their '892 patent feature valuations capped by Dr. Steckel.

*I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.*

Dated: June 25, 2015

By: *Michael B. Mazis Ph.D.*

Michael B. Mazis, Ph.D.