**Exhibit 17**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| VISTEON GLOBAL TECHNOLOGIES, INC. and VISTEON TECHNOLOGIES, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>GARMIN INTERNATIONAL, INC.,<br><br>Defendant. | C.A. No.: 2:10-cv-10578-PDB-MAR |

## DECLARATION OF JOEL STECKEL PH.D.

Scott A. Wolfson (P53194)
swolfson@wolfsonbolton.com
WOLFSON BOLTON PLLC
3150 Livernois, Suite 275
Troy, Michigan 48083
(248) 247-7103 - Telephone
(248) 247-7099 - Facsimile

**Attorneys for Plaintiffs Visteon Global Technologies, Inc. and Visteon Technologies, LLC**

Richard M. McDermott
rick.mcdermott@alston.com
Jitendra Malik
jitty.malik@alston.com
ALSTON & BIRD LLP
Bank of America Plaza
101 South Tryon Street, Suite 4000
Charlotte, North Carolina 28280-4000
(704) 444-1000 – Telephone
(704) 444-1111 – Facsimile

I, Joel Steckel, having personal knowledge of the facts stated below, and under penalty of perjury of the laws of the United States, hereby declare that:

1. I make this declaration at the request of counsel for Visteon Global Technologies, Inc. and Visteon Technologies, LLC ("Visteon") and, if called to testify at a hearing as to the content of this declaration, I would testify competently thereto.

2. This Declaration is submitted in support of Visteon's Opposition to Garmin's Motion to Exclude Dr. Joel Steckel's Conjoint Survey and Conclusions Derived Therefrom and Visteon's Opposition to Garmin's Motion to Exclude Peter Smith's Reasonable Royalty Calculations and Opinions Regarding Damages.

**Background**

3. I am a Professor of Marketing at the Stern School of Business, New York University, where I have taught since January 1989. I was the Chairperson of the Marketing Department for six years, from July 1998 to June 2004. I am currently the Vice Dean of Doctoral Education and have led the Stern School's doctoral program since May 2007. I have also held either permanent or visiting faculty appointments at the Graduate School of Business, Columbia University; Yale University; and the Wharton School, University of Pennsylvania. I received my B.A. from Columbia University

in 1977, and M.B.A., M.A., and Ph.D. degrees from the Wharton School, University of Pennsylvania in 1979, 1980, and 1982, respectively.

4. I was the Founding President of the INFORMS (Institute for Operations Research and Management Science) Society for Marketing Science, the foremost professional group for the development and application of management science theory and tools in marketing. I am a Co-Editor for the journal *Marketing Letters*. In addition, I am a member of the American Marketing Association, the American Statistical Association, the Association for Consumer Research, the American Association for Public Opinion Research, the International Trademark Association, and the Society for Consumer Psychology.

5. My fields of specialization within marketing include marketing strategy, marketing research, and consumer decision-making. I am an author of three books and over 40 articles. In the course of my scholarly research, teaching, and consulting work, I have studied issues of marketing research, product design, branding, pricing, and their roles in consumer choice and marketing strategy. During my career, I have taught M.B.A. students about, written textbook chapters on, and lectured executives on conjoint analysis. I have also published research using and advancing the state of the art of conjoint analysis. My professional qualifications are described further in my

2

curriculum vita which is attached as Exhibit A. I have served as an expert witness on marketing strategy, consumer behavior, marketing research, and branding issues in a variety of litigation matters. In the past four years, I have testified as an expert witness in the matters listed in Exhibit B.

6. I have prepared and submitted an expert report and a revised expert report in this matter on September 12, 2012 and November 30, 2012, respectively. Each of these reports includes additional details on (1) my background, (2) my analyses and conclusions in this matter, and (3) the materials I have reviewed in reaching these conclusions. I fully adopt the analyses and opinions in both reports, as corrected by me, and if called to testify at a hearing as to the content of either report, I would testify competently thereto.

7. Since my November 30, 2012 Revised Report, I have additionally considered the Supplemental Expert Report of Dr. Michael B. Mazis, Ph.D., dated December 24, 2012 ("Exhibit 1") the transcript of Peter Smith's deposition held January 29, 2013, the Declaration of Michael B. Mazis, Ph.D., dated June 25, 2015 ("Exhibit 2"), Garmin's Motion to Exclude Dr. Joel Steckel's Conjoint Survey and Conclusions Derived Therefrom, dated June 25, 2015, D.E. 259 ("Steckel Motion"), and Garmin's Motion to Exclude Peter Smith's Reasonable Royalty Calculations and Opinions Regarding Damages, dated June 25, 2015, D.E. 260 ("Smith Motion").

**Conjoint Analysis Generally; Indicia of Reliability**

8. At the outset, I note that I have not received and reviewed the calculations that Dr. Mazis performed in his Declaration dated June 25, 2015, and I am thus unable to verify the accuracy of those calculations and any conclusions drawn from those calculations. I have assumed in my comments below that the calculations are correct.

9. In Garmin's Motion, counsel for Garmin suggests a number of criticisms, comparisons and alternative survey analysis methods which purportedly demonstrate why the survey and conjoint analysis methodology employed by myself and Mr. Peter Smith to calculate a reasonable royalty are somehow flawed and, therefore, unreliable. I will address each of these contentions in the order they are presented in the Motion.

10. Garmin's calculation of the Economic Values of the patented features which adds up to $1,802.59 is not appropriate within the context of conjoint analysis. I have not seen the details of this calculation, so I cannot verify that I agree with this intermediate result. However, I understand the $1,802.59 to be a calculation for a single individual in my sample. As such, it is at best an intermediate result. As anyone versed in conjoint analysis knows, it is a technique designed to make aggregate inferences, not inferences with respect to individuals within a sample. That Garmin and its

4

expert Dr. Mazis, attempts to do so reflects either a fundamental misunderstanding of conjoint analysis or a deliberate attempt to mislead the Court. Normally, I would give them the benefit of the doubt and say that they simply do not understand conjoint analysis and its applications. However, other assertions they make suggest that this is not the case. I shall explain shortly.

11. In addition, as I began to explain in my second deposition, conjoint analysis often employs bounding of intermediate individual estimates in order to remove outliers which would otherwise have a disproportionate effect on the resulting overall aggregate Economic Values. Deposition Testimony of Dr. Joel Steckel, dated Jan. 16, 2013, 311:9-312:11 ("Exhibit 3"). Bounding of the "raw, unadjusted" individual intermediate estimates before drawing conclusions is normal and accepted practice. Setting a lower and upper bound to the survey data at $0 and $20, respectively, ensures that the conclusions drawn from my analysis meet commonly held expectations.

12. Selection of these lower and upper bounds is not a quantitative effort which can be defined as "correct" or "incorrect," rather it is a qualitative judgment call that is made typically upon a graphical review of the raw data and/or intermediate statistical results in order to capture the most reliable conclusions from the data using the most appropriate assumptions. *See* Ex.

5

3, 317:3-319:4 (explaining that the choice for lower and upper bounds is not a binary correct/incorrect analysis).

13. With the foregoing in mind, it continues to be my opinion that removal of the lower and upper bounds, as was done by Dr. Mazis, is inappropriate. Ex. 1, ¶¶ 20-26; Ex. 2, ¶¶ 10-14; Ex. 3, 310:16-19 ("In any event, I understand that Dr. Mazis claims to have addressed that issue and unbounded them. I believe that bounding them is the right thing to do."). However, during my deposition I indicated that *if* one were to remove the lower and upper boundaries, an alternative, possibly defensible approach would be to use the *median* values of the individual estimates rather than the *mean* values. Ex. 3, 311:25-312:4. This assertion was made without review of the survey data and its resulting implications. It was by no means an endorsement of an appropriate way to look at things.

14. Regardless of the defensibility of un-bounding the individual estimates and taking the median values to alternatively calculate an Economic Value of $1,802.59 for the patented features, comparison of that number with the $119.99 personal navigation device ("PND") price is not an indicator of survey reliability. As explained in my Revised Report, the $119.99 price was used (1) to measure value associated with all the other attributes and (2) as a reference price of PNDs on the market. Revised Expert Report of Joel

6

Steckel, Ph.D., Nov. 30, 2012, ¶¶ 38, 65 ("Exhibit 4"). In contrast, the Economic Values contained in Table 5 represent the economic value that GPS owners attach to the patented features. *Id.* at ¶ 8. By directly comparing these two values, Garmin violates the conditions and assumptions of my study as well as commonly accepted principles and indicia of reliability of economic logic. Of course, the value of the components has to exceed the product's price. Otherwise, no one would buy the product.

15. Similarly, Garmin's assertion that the percentage of individual conjoint estimates affected by a boundary condition is somehow an indicator of reliability of the survey is completely unfounded in any scholarly research or articles that I have ever reviewed or encountered and that discuss conjoint survey analysis. The use of boundaries to ensure the reliability of the survey data used for analysis is a commonly accepted practice. Indeed, Dr. Mazis himself does not state that the percentage of data affected by a boundary condition is an indicator of survey reliability, he can't because that assertion, simply, is false. Ex. 2, ¶ 14.

**Alteration vs. Bounding**

16. Garmin's Motion and Dr. Mazis Supplemental Report indicate that part of my analysis was to "alter" survey data in order to fit the data to some pre-determined conclusion. Ex. 1, ¶¶ 24-26; D.E. 259, at 9. I wholeheartedly

7

deny any assertion that I fraudulently altered any survey data acquired as part of this study. In fact, I find such an assertion outrageous and insulting. I would like to reemphasize a point that I have repeatedly made that there is a distinction in survey design and analysis between "altering" data and subjecting results derived from those data to statistical constraints and boundaries in order to increase the statistical reliability of those data. My analyses associated with this case regarding boundaries and constraints comply with commonly accepted practices of statistical analysis and in no way can be considered "alteration" of survey data. For Garmin and Dr. Mazis to make such an assertion can only be construed as a deliberate attempt to mislead the court.

**Survey Design**

17. The conjoint survey conducted for this case was designed to test the relative value of the patented features as claimed in each of the patents-in-suit to consumers. As I described in my second deposition, the design of survey questions is more of an art than a science. Ex. 3, 148:9-149:15. Survey questions are tailored to describe to consumers, in clear terms, the function of a feature to ascertain certain characteristics about that feature. As such survey questions are focused on the function of the claimed features, not the specific language used in patent claim language. Therefore, slight variations

8

in claim language (say from "method" to "system" claims) do not necessarily have an appreciable impact upon the survey questions asked or conclusions that can be drawn from those questions.

**Distracter Features**

18. Garmin has indicated that proper conjoint survey design includes distracter features which are known to drive the price point of the tested consumer products. While this may be true for certain conjoint analyses that are designed to directly measure results of new product introductions into competitive markets, valuable distracter features are not required for the type of conjoint analysis employed in this case designed to ascertain the Economic Values placed on the patented features by consumers. With new product introductions, distracter features are required to capture consumer choices in a simulated marketplace. In measuring Economic Values, distracter features are required merely to distract, thus the name.

**Peter Smith's Damages Calculation**

19. As described in my Original and Revised Reports, the Economic Values do not represent the price a consumer would be willing to pay for the inclusion of the patented feature, rather the Economic Values (which represent consumer value) are one factor to be considered in conjunction with producer costs and competition to determine the impact on price of a

patented feature in a competitive marketplace. Ex. 4, ¶ 69. After review of Peter Smith's Report, Supplemental Reports and deposition testimony, I believe his analysis appropriately utilizes the partworth Economic Values from my conjoint analysis, accounts for producer costs and competition, and accurately calculates a reasonable royalty for each of the patented features.

20. The Sawtooth materials that Garmin cites in its Motion are inapplicable to the results generated in the conjoint survey I conducted and do not apply to Peter Smith's analysis. Any restrictions on the use of the Economic Values were properly accounted for in Mr. Smith's method as was discussed above in ¶ 19. The Sawtooth quote relates to new product introductions in a competitive marketplace. D.E. 260, at 8-9. As both Mr. Smith and I have stressed, my conjoint analysis measures the economic value of specific benefits to consumers, a very different situation.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

This 13th day of July, 2015.

By: */s/ Joel Steckel*_____

Joel Steckel, Ph.D.