UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VISTEON GLOBAL TECHNOLOGIES, INC.
AND VISTEON TECHNOLOGIES, LLC,

                  Plaintiffs,                      Case No. 10-cv-10578

                                          Paul D. Borman
v.                                    United States District Judge

GARMIN INTERNATIONAL, INC.,

                  Defendant.
_____/

OPINION AND ORDER
(1) GRANTING VISTEON'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OF THE
VISTEON-ALSTON BIRD AGREEMENT (ECF NO. 252);
(2) DENYING VISTEON'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OF THE
VISTEON-HORIZON LICENSE (ECF NO. 253); AND
(3) DENYING VISTEON'S *DAUBERT* MOTION TO EXCLUDE MICHAEL NEWELL
FROM OFFERING ANY DAMAGES TESTIMONY ON BEHALF OF GARMIN (ECF NO.
256)

The parties in this patent litigation have filed numerous motions *in limine*, several of which are addressed in this Opinion and Order. Presently before the Court are: (1) Visteon's Motion *in Limine* to Exclude Evidence of the Visteon-Alston Bird Agreement (ECF No. 252); (2) Visteon's Motion *in Limine* to Exclude Evidence of the Visteon-Horizon License (ECF No. 253); and (3) Visteon's *Daubert* motion to Exclude Michael Newell From Offering Any Damages Testimony on Behalf of Garmin (ECF No. 256). The Court has determined that oral argument will not assist in resolution of the matters raised in these motions and accordingly will decide these matters on the parties' written submissions. *See* E.D. Mich. L.R. 7.1(f)(2).

1

## I.   BACKGROUND

This is an action for patent infringement.  In the claims that remain for trial, Plaintiffs Visteon Global Technologies, Inc. and Visteon Technologies, LLC ("Visteon") contend that Defendant Garmin International, Inc. ("Garmin") infringes, either directly or indirectly, U.S. Patent No. 5,544,060 ("the '060 patent"), U.S. Patent No. 5,654,892 ("the '892 patent") and U.S. Patent No. 5,832,408 ("the '408 patent").  In general, the '060 patent is directed to a method of navigating a human driven vehicle whereby a user can generate an optimal path and then switch to an alternate navigation path before beginning on the optimal path.  Visteon contends that Garmin directly infringes Claims 3, 4, and 6 and indirectly infringes Claim 3 of the '060 patent.  In general, the '892 patent is directed to a method for assisting the navigation of a vehicle whereby a complex arrow icon is generated and displayed to the driver at a predetermined time or distance before the driver reaches a particular maneuver.  Visteon contends that Garmin directly and indirectly infringes Claim 8 of the '892 patent. In general, the '408 patent is directed to a navigation system which allows the user to search for a destination either from a list of categories or from an alphanumeric search.  Visteon contends that Garmin directly and indirectly infringes Claims 4 and 5 of the '408 patent.

Visteon contends that a variety of Garmin navigation products ("the accused products") infringe one or more the asserted claims literally and under the doctrine of equivalents.  Visteon contends that Garmin directly infringes, actively induces infringement and/or contributorily infringes one or more of the asserted claims of the asserted patents, and that Garmin's infringement is and has been willful.  Visteon seeks damages in the form of a reasonable royalty for Garmin's alleged infringement.  Visteon also seeks prejudgment interest, enhanced damages, attorneys' fees, and costs, including without limitation any fees and costs associated with participating in multiple

*ex parte* proceedings at the United States Patent and Trademark Office ("USPTO") as initiated by Garmin in this action. Garmin denies that it directly, indirectly or contributorily infringed or induced infringement of any of the patents in suit and affirmatively asserts a host of invalidity defenses. Garmin seeks judgment in its favor and requests that it be awarded its costs and reasonable attorneys' fees incurred in defending against Visteon's Complaint.

The parties have filed numerous motions *in limine*, including several *Daubert* motions seeking to exclude, to one degree or another, the testimony of the opposing party's experts. This Opinion and Order addresses: (1) Visteon's Motion to Exclude Evidence of the Engagement Agreement for Legal Services between Visteon and Alston & Bird (ECF No. 252); (2) Visteon's Motion to Exclude Evidence of the Visteon-Horizon License (ECF No. 253); and (3) Visteon's *Daubert* Motion to Exclude Michael Newell From Offering and Damages Testimony on Behalf of Garmin (ECF No. 256).

## II.   STANDARD OF REVIEW

"The Federal Rules of Evidence, the Federal Rules of Criminal and Civil Procedure and interpretive rulings of the Supreme Court and this court all encourage, and in some cases require, parties and the court to utilize extensive pretrial procedures – including motions *in limine* – in order to narrow the issues remaining for trial and to minimize disruptions at trial." *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999). District courts have broad discretion over matters involving the admissibility of evidence at trial. *United States v. Seago*, 930 F.2d 482, 494 (6th Cir. 1991).

"Admissibility of expert testimony is governed by Federal Rule of Evidence 702 and informed by the seminal case applying Rule 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,

3

509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)." *In re Southeastern Milk Antitrust Litigation*, 739 F.3d 262, 267 (6th Cir. 2014). Fed. R. Evid. 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"[T]he rules of evidence - especially Rule 702 - do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). The trial court's "gatekeeping" task with respect to expert testimony applies not just to scientific evidence, as was at issue in *Daubert*, but to all types of specialized knowledge presented through an expert witness. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148-49 (1999). ""[T]he relevant reliability concern may focus upon personal knowledge or experience . . . [as] there are many different kinds of experts, and many different kinds of expertise." *Id*. at 150. The Court must analyze separately the proposed expert's qualification, reliability and helpfulness.

"Whether proffered evidence should be admitted in a trial is a procedural issue not unique to patent law, and therefore we review the district court's decision whether to admit expert testimony under the law of the regional circuit . . . ." *Micro Chem., Inc. v. Lextron*, 317 F.3d 1387, 1390-91 (Fed Cir. 2003). The Sixth Circuit has noted that absolute certainty is not required of an expert but

4

that sheer speculation, regardless of the qualifications of the speculator, lacks sufficient reliability:

> Rule 702, we recognize, does not require anything approaching absolute certainty. *See Daubert*, 509 U.S. at 590, 113 S.Ct. 2786. And where one person sees speculation, we acknowledge, another may see knowledge, which is why the district court enjoys broad discretion over where to draw the line.

*Tamraz v. Lincoln Elec. Co*., 620 F.3d 665, 671-72 (6th Cir. 2010).

To determine the testimony's reliability, the court does not "determine whether [the opinion] is correct, but rather [determines] whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal Antitrust Litig*., 527 F.3d 517, 529–30 (6th Cir. 2008) (alterations added). "As gatekeeper, the trial court only determines the admissibility of expert evidence; the jury determines its weight. The court's focus is 'solely on principles and methodology, not on the conclusions that they generate.'" *United States v. Stafford*, 721 F.3d 380, 393-94 (6th Cir. 2013) (quoting *Daubert*, 509 U.S. at 595). "[R]ejection of expert testimony is the exception, rather than the rule." *In re Scrap Metal*, 527 F.3d at 530 (alteration added).

## III.   ANALYSIS

Each of the motions addressed in this Opinion and Order relates to the issue of calculating reasonable royalty damages. "Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. "The burden of proving damages falls on the patentee." *Lucent Technologies, Inc. v. Gateway, Inc*., 580 F.3d 1301, 1324 (Fed. Cir. 2009). "Litigants routinely adopt several approaches for calculating a reasonable royalty." *Id*. One common method, which is not at issue in this case, "focuses on the infringer's projections of profit for the infringing product." *Id*. "The second and more common approach," which is the method invoked by the parties in this case, is

"called the hypothetical negotiation or the 'willing licensor-willing licensee' approach, [which] attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before the infringement began." *Id*. (alteration added). A hypothetical negotiation assumes that the patents asserted are valid and have been infringed. *Id.* at 1325.

In conducting the reasonable royalty analysis, Courts routinely look to the "*Georgia-Pacific* factors," one of which directs consideration of "[t]he royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty." *Georgia-Pacific Corp. v. U.S. Plywood Corp*., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). The Federal Circuit has repeatedly held that not just any license will serve as a reasonable comparator. "[L]icenses relied on by the patentee in proving damages [must be] sufficiently comparable to the hypothetical license at issue in suit," *Lucent*, 580 F.3d at 1325, and cannot be "radically different from the hypothetical agreement under consideration," *id*. at 1327. A proffered comparable license "must be tied to the relevant facts and circumstances of the particular case at issue and the hypothetical negotiations that would have taken place in light of those facts and circumstances at the relevant time." *Uniloc USA, Inc. v. Microsoft Corp*., 632 F.3d 1292, 1317-18 (Fed. Cir. 2011). "[C]omparisons of past patent licenses to the infringement must account for 'the technological and economic differences' between them." *Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010) (quoting *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 873 (Fed. Cir. 2010)). Generally speaking, the "degree of comparability" of licenses, "as well as any failure on the part of [the proponent's] expert to control for certain variables are factual issues best addressed by cross examination and not by exclusion." *ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) (alteration added).

6

A.     **Visteon's Motion *In Limine* No. 6 to Exclude Evidence of the Engagement Agreement for Legal Services Between Visteon and Alston & Bird.**

Garmin seeks to introduce evidence of the engagement agreement for legal services between Visteon and their attorneys in this action, Alston & Bird ("Alston Bird"), and a settlement agreement that was entered into as part of Visteon's 2009 bankruptcy, as relevant "data points" in determining a reasonable royalty to which the parties would have agreed in a hypothetical negotiation. Visteon moves to exclude evidence of and/or reliance on the fee agreement or the settlement agreement on the basis that both are "radically different" from any agreement that would have been negotiated during a hypothetical negotiation and would be more prejudicial than probative. Garmin responds that Visteon's "comparable license" argument misses the point because the "A&B Settlement is not a license at all; it is a direct valuation by Visteon of the asserted patents" and therefore "serves as a relevant data point in determining the value which the parties would place" on the patents in suit. Resp. 7. Garmin relies on a series of cases in which courts have admitted evidence of a patent-holders prior patent valuations as relevant to the reasonable royalty calculation.

For the reasons that follow, the Court concludes that the Visteon-Alston Bird fee agreement, and the settlement agreement entered into in the bankruptcy proceedings, lack probative value and present a danger of confusion of the issues and prejudice in the minds of the jury. Accordingly, both agreements will be excluded. Similarly, Garmin's expert, Michael Newell, will be precluded from referring to or relying on these agreements as "data points" in his reasonable royalty analysis.

Effective July 31, 2009, Visteon and Alston Bird entered into an Engagement Agreement (ECF No. 258, Visteon Index of Exhibits, Exhibit 7), pursuant to which Visteon engaged Alston Bird as legal counsel in connection with the enforcement of 14 different patents (among them the four patents-in-suit) through negotiations and/or lawsuits. Under the Engagement Agreement,

Alston Bird agreed "to a contingent fee arrangement, on the ground that [Visteon] lack[ed] the funds necessary to prosecute the Visteon Patent Lawsuits at the Law Firm's standard billing rates." (ECF No. 274-3, Sealed Exhibit 7 ¶ 3.)  Under the contingent fee arrangement, Visteon agreed to pay Alston Bird, as fees for services in any given Patent Lawsuit, a percentage of the adjusted gross recovery depending upon the stage at which the recovery is obtained, i.e. 20% if before depositions, 30% if after depositions but before close of discovery, 35% if after close of discovery but before trial, and 40% if at any time after the start of trial. *Id.*

Because Visteon had filed for bankruptcy protection under Chapter 11 in the United States Bankruptcy Court for the District of Delaware in May, 2009 (U.S. Bankr. 09-11786, D. Del. May 28, 2009), Visteon was required to and did seek approval of its Engagement Agreement with Alston Bird from the Delaware Bankruptcy Court and also sought to have the Bankruptcy Court approve a Compromise and Settlement between Visteon and Alston Bird regarding pre-petition fee payments made to Alston Bird by Visteon in the amount of $294,354.74, which would have been subject to challenge in the bankruptcy proceedings as an avoidable transfer occurring within the 90-day period preceding Visteon's filing.  (ECF No. 297, Garmin's Response Exhibits, Exhibits LL and MM). Under the Compromise and Settlement, Alston Bird agreed "to credit [Visteon] for fees and expenses received from Visteon within 90 days" preceding the filing of its bankruptcy petition against any amount due to Alston Bird under the structured fee arrangement set forth in the Engagement Letter. (Garmin's Response Exhibits, Exhibit MM ¶ 16.)  This fee amount represented approximately 1,000 hours of Alston Bird attorneys' time prior to Visteon's May, 2009 petition date, spent studying Visteon's patent portfolio and advising Visteon as to possible enforcement strategies and outcomes. *Id.* ¶ 15.

Garmin now argues that this Compromise and Settlement between Visteon and Alston Bird regarding the pre-petition fees, which was approved by the Delaware Bankruptcy Court, is evidence that Visteon valued its entire patent portfolio (the 14 patents that Alston Bird agreed to review) to be worth somewhere between $735,000 ($294,000 being 40% of $735,000 - the upper end of the fee schedule) and $1.47 million ($294,000 being 20% of $1.47 million - the lower end of the fee schedule) at the time it filed for bankruptcy protection in May, 2009. The Court concludes that Garmin's logic is flawed and that, in any event, presenting its "theory" based upon the Engagement Agreement and the Settlement and Compromise would confuse the jury, would lack sufficient probative value and would create a danger of prejudice to Visteon.

To begin with, the Federal Circuit has cautioned that "[t]he propriety of using prior settlement agreements to prove the amount of a reasonable royalty is questionable." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012). In *LaserDynamics*, the Federal Circuit was addressing a prior settlement of a patent infringement claim, but similar coercive pressures no doubt were exerted in the context of both the Engagement Letter and the Compromise and Settlement here, both negotiated during Visteon's bankruptcy proceedings, a distinctly different setting than a hypothetical negotiation between willing bargaining parties. Specifically, the relevant terms of the Compromise and Settlement are as follows:

> 6. In the months leading up to the Petition Date, Visteon hired A&B to advise it concerning the scope of its GPS Patent portfolio and to begin certain suggested enforcement efforts. Such efforts were the result of an hourly engagement and led to the identification of several entities in need of a license from Visteon. As a result of such efforts, Visteon paid A&B $294,354.74 for fees and expenses, which monies may be claimed to be avoidable transfers.
>
> 7. A&B's enforcement efforts on behalf of Visteon are not complete and the Debtors therefore seek to engage A&B to continue such work on a contingent fee basis and are filing, contemporaneously herewith, the Debtors' Application for Entry of an

Order Authorizing the Employment and Retention of Alston & Bird LLP as Special Litigation Counsel to the Debtors (the "A&B Retention Application").  A&B has agreed to so represent Visteon on the terms set forth in the A&B Retention Application and to give Visteon a credit against the agreed contingency fee equal to the pre-petition fees and expenses paid by Visteon to A&B, so long as, and to the extent that, all of the Debtor's claims against the pre-petition fees and expenses are released.

8.  Based on the above, the terms of the Compromise and Settlement are as follows:

(a) In exchange for A&B (i) representing Visteon on a contingent fee basis according to the terms set forth in that certain engagement letter dated July 31, 2009 (the "Engagement Letter"), attached hereto as Exhibit B, and (ii) giving Visteon a credit against any fees owing to A&B that result from such terms in the amount of $294,354.74;

(b) The Debtors and representatives hereby waive, release, resolve, compromise and settle any and all claims arising under Chapter 5 of the Bankruptcy Code in connection with the monies paid by Visteon to A&B prior to the petition Date.

(Garmin's Response Exhibits, Ex. MM ¶¶ 6-8.)

Reading together the terms of the Engagement Letter and the provisions of the Compromise and Settlement, it appears that Alston Bird agreed to represent Visteon in its patent enforcement efforts on a contingent fee basis, with the proportion of its fee relative to the ultimate recovery increasing, as one would expect, from 20% to 40% as Alston Bird attorney time increased along with the duration and complexity of the litigation.  The Compromise and Settlement addressed the $294,354.74 in fees that Visteon had already paid Alston Bird prior to the date it filed its petition, which stood to be challenged as an avoidable transfer under the bankruptcy code.  The Compromise and Settlement requires Alston Bird to "credit" the $294,354.74 against any recovery of fees to which it may become entitled under the Engagement Agreement.  As Visteon points out in its Reply, $300,000 was "a drop in the bucket" compared to the millions in fees that a typical patent case may cost a litigant when a case is taken through the discovery phase, fees that Visteon would face in the

absence of the contingency fee arrangement set forth in the Engagement Letter.  ECF No. 311,

Visteon's Reply 4.

      Neither the Engagement Agreement nor the Compromise and Settlement mentions the value

of Visteon's entire patent portfolio, or the value of the patents in suit.  Citing to Visteon's

application to the bankruptcy court for approval of the Compromise and Settlement, Garmin states:

> In the bankruptcy proceeding, Visteon settled an approximately $300,000 debt it
> owed to Alston and Bird (A&B) by granting A&B a stake in proceeds from the
> asserted patents.  Visteon's Motion and the Debtor's Application describe the
> settlement as a "good faith" "business" valuation of the asserted patents.  The
> valuation was stated by the Debtors to be "reasonable" and "market based."

ECF No. 292, Resp. 1-2 (citing Garmin's Resp. Exs. LL at 6 and MM at 8.)  In fact what the parties

represented as "reasonable" and "market based" was the contingency fee structure set forth in the

Engagement Agreement, *see* Ex. LL ¶ 12, and what the parties represented as having been

negotiated at "arm's length" and in "good faith" was the settlement of the $294,354.74 pre-petition

"transfer" to Alston Bird with a credit in that amount from Alston Bird to Visteon from any

enforcement proceeds, *see* Ex. MM ¶¶ 17-18.  Garmin asserts that "Visteon moved the bankruptcy

court to approve a settlement based on a valuation of Visteon's GPS patents," citing to Exhibit MM,

yet nothing in either the Engagement Agreement or the Compromise and Settlement suggests that

Visteon was placing a value on their entire patent portfolio when agreeing to credit Alston Bird

$294,354.74 from any enforcement proceeds.  Garmin states, again without citation to any evidence

in the record, that this "valuation was premised on what Visteon anticipated it could recover as

licensing revenue for a credit against the $294,354.74 debt.  In order to represent a fair valuation,

Visteon anticipated recovering anywhere from $735,000 to $1.47M from its patents."  Resp. 6

(explaining in footnote 2 that "20% of $1.47M is ~$294,000 and 40% of $735,000 is ~294,000).

Garmin states that "the A&B Settlement is not a license at all; it is a direct valuation by Visteon of the asserted patents," and that it "serves as a relevant data point in determining the value which the parties to the hypothetical negotiation would place on" the patents.  Resp. 7.  Garmin interprets the Compromise and Settlement to mean that Visteon was willing to give away a 20% to 40% stake in the proceeds of its patents in return for approximately $300,000, yielding a presumptive total value of $735,000 to $1.47 million.  Resp. 7 ("Visteon was willing to accept approximately $300K in exchange for a 20-40% stake in the proceeds of its patents.").  Visteon submits that it did not turn over 20-40% stake in its patents for $300,000 – it turned over a 20-40% stake in its patents in return for potentially millions of dollars worth of legal services – of which $294,354.74 in pre-petition payments was just a small portion.

Garmin's expert, Michael Newell, who relies on this "valuation" as a "data point" in his reasonable royalty analysis, does nothing to clarify Garmin's theory:

> So the calculation I did that I thought was confirmatory was I – on one hand Alston & Bird is, in essence, giving about $300,000, or allowing Visteon to erase that debt. In exchange it gets anywhere from between 20 percent and 40 percent of any recoveries from, among other things, the patents-in-suit. So my understanding of this agreement is the 20 percent is what they would – what Alston would get if it – if it did – it could get that even if it didn't do anything, because my understanding is that 20 percent is what they would receive prior to discovery. . . So this is the patents themselves, the patents-in-suit in this case are being exchanged on a fair market value, arm's length transaction with Alston & Bird for this approximately $294,000 debt.

ECF No. 258-2, Newell Dep. 109:21-110:8; 113:16-20.  So, apparently, Newell concludes, that 20 to 40 percent of the value of the recovery efforts must be worth no more than $294,354.74 and therefore Visteon (and Alston Bird) must value its patent portfolio to be worth between $735,000 and $1.47M.

12

As Visteon explains in its Reply, the $294,534.74 represented the value of Alston Bird's pre-petition legal services, without reference to the value of the patents in suit and the Engagement Agreement covered future fees as well as settling the $294,354.74 pre-petition debt.   Any "agreement" that Garmin seeks to rely upon "to support a reasonable royalty analysis must be proven to be sufficiently comparable" to the hypothetical negotiation at issue "with respect to technology, economic terms, and time period." *Apple v. Motorola, Inc.*, 757 F.3d 1286, 1315 (Fed. Cir. 2014), overruled on other grounds in *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015).

Garmin's interpretation of the Engagement Agreement and the Settlement and Compromise, and its theory of comparability, are confusing at best and misleading at worst.  Every single case on which Garmin relies for the proposition that a patent holder's valuation of their patents is the best evidence of value involves an actual value placed by the patent holder on a patent and the issue and the issue in those cases was whether the circumstances under which the patent holder arrived at that value actually reflect true value or involve other circumstances or economic pressures that so changed the patent holder's position that it is unfair to hold the patent holder to their own assigned value.  *See Robocast, Inc. v. Microsoft Corp*., No. 10-1055, 2014 WL 202399, at *2-3 n. 3 (D. Del. Jan. 16, 2014) (holding that defendant's expert could reasonably rely on plaintiff's own valuation of its patent even though he was unaware of certain factors underlying the valuation); *Oracle America, Inc. v. Google Inc.*, No. 10-03561, 2012 WL 877125, at *1 (N.D. Cal. March 15, 2012) (holding that a report prepared by Oracle's accounting department calculating the value of the patents of a company that Oracle was seeking to acquire was relevant and could be relied upon by Google's expert); *Whatley v. Nike, Inc.*, No. 98-963, 2000 WL 33201902, at *3 (D. Or. Oct. 20,

2000) (finding that plaintiff's patent valuation in his marital property division was relevant and admissible at an infringement trial); *Apple, Inc. v. Samsung Elec. Co., Ltd.*, No. 12-0630, 2013 WL 1563253, at *5 (N.D. Cal. April 12, 2013) (requiring Apple to produce its internal pricing strategy documents, which may include discussions about the relative value of the patented features to its products, as relevant to a *Georgia-Pacific* analysis); *Spectralytics, Inc. v. Cordis Corp*., 649 F.3d 1336, 1347 (Fed. Cir. 2011), abrogated by *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 136 S. Ct. 1923 (2016), (Spectralytics' asset sales agreement, which included a 25-percent share of any future recovery for patent infringement, was reasonably considered by the jury and assigned little weight). In each of these cases the "valuation" at issue was indisputably just that – a valuation of the worth of a patent or group of patents. The issue was whether the circumstances of the valuation were sufficiently reliable, not whether the patents were in fact the object of the valuation. None of these cases involve a contingency fee agreement or demonstrate that such an agreement represented a valuation of the patents in suit. None therefore supports Garmin's method of conflating Alston Bird's agreement regarding a credit from Visteon's enforcement proceeds for pre-petition legal services with the value of Visteon's patents.

Substantial trial time would be involved in placing these agreements before the jury, explaining their context and limited relevance, and trying to convey a convoluted theory of how they might reflect the value of the patents in suit. Any limited relevance that the Compromise and Settlement or the Engagement Agreement might have is substantially outweighed by the waste of time, risk of confusion and danger of prejudice it would engender. Therefore, evidence of both will be excluded at trial under Fed. R. Evid. 402 and 403, and Garmin's damages expert will be precluded from relying on either the Engagement Agreement or the Settlement and Compromise in

14

proffering his reasonable royalty calculation.

**B.      Visteon's Motion *In Limine* No. 7 to Exclude Evidence of the Visteon-Horizon License**

In April, 2002, Visteon and Horizon Navigation, Inc. ("Horizon") entered into a Technology Transfer and License Agreement and an Asset Purchase Agreement (collectively the "2002 Agreement"), under which Visteon agreed to the sale and license of various intellectual property rights to Horizon, including the sale of more than 20 U.S. patents, the sale and license back of approximately 30 U.S. patents, and a license of more than 10 U.S. patents, including the patents in suit.  Garmin's Resp. Ex. NN, Annex 1.09, 1.16, 1.17; Visteon's Mot. Ex. 8, Ex. A, Art. 2.01-2.02, Annex 1.09, 1.16, 1.17.  The 2002 Agreement also transferred software, trademarks, copyrights and good will.  *Id.* Ex. A, Art. 2.01.  Visteon argues that the Visteon-Horizon agreement is not comparable to any license to which Visteon and Garmin would have agreed because it occurred two years prior to the date of the hypothetical negotiation, involved patents and other technology beyond just the patents in suit and involved parties that occupied vastly different bargaining positions.

Laura White, a former employee of Visteon Technologies, left Visteon  (actually was forced to leave when Visteon began to consider spinning off Technologies) and formed Horizon and became that company's President.  Horizon eventually acquired Visteon Technologies' assets from Visteon and Ms. White executed both of the 2002 Agreements on behalf of Horizon.  Visteon Ex. 9, April 2, 2012 Deposition of Laura White, 62:23-63:2; 65:24-67:17.  It was Ms. White's understanding that Visteon was "bleeding cash" and wanted to sell Visteon Technologies to raise money.  *Id.* at 56:32-23, 57:4-5.  According to Ms. White, however, Visteon was unwilling to negotiate and made Horizon a "take it or leave it" offer of $1.5 million for the sale  of Visteon Technologies' assets, including the sale of some patents, the sale and license back of others and the

15

licensing of others. *Id*. at 67:24-69:4.  Visteon dictated, and refused to negotiate on, which patents would be transferred outright, which would be transferred to Horizon and licensed back to Visteon and which patents Visteon would retain title to and license to Horizon to protect the Visteon navigation product.  *Id*. at 73:74:18. The patents in suit were among those that Visteon would only license to Horizon.  Visteon Ex. 8, Ex. A, Annex 1.09.  The license granted on the patents listed in Annex 1.09 was "a non-exclusive, paid-up, non-assignable license to the Licensed Patents to make, use, sell and offer for sale the Transferred Software or any other product."  Visteon Ex. 8, § 3.01. Ms. White testified that Horizon desired to obtain title to these patents listed on Annex 1.09, including the patents in suit, because Visteon didn't "really know what they had" but these patents were "valuable" to her to "protect the intellectual property that [Technologies] had been developing for so many years." *Id*. at 104:17.  Ms. White testified that Horizon wanted but was unable to offer more than $1.5 million to obtain title to the patents that were listed on Annex 1.09 and retained by Visteon. *Id*. at 121:7-12.  Ms. White confirmed that this license of 10 patents, including the patents in suit, "allowed Horizon to make products potentially covered by those patents for other companies . . . [i]ncluding potential competitors of Visteon. . . . and including other OEM navigation system suppliers besides Visteon."  White Dep. 75:9-18.  Horizon was not authorized to sublicense the patents.  Visteon Ex. 8, § 3.01.  Ms. White confirmed that $1.3 million of the $1.5 million purchase price was allocated for intellectual property, including the patents in suit.  White Dep. 83:19-24. Ms. White was unaware of any efforts by Visteon to license any of Visteon Technologies' patents prior to the time that Ms. White left Visteon Technologies to form Horizon.  *Id*. at 91:18-22. Ms. White testified at one point that Horizon views Garmin as a competitor in the GPS navigation system market and later testified that she views them as both a competitor and a customer and

regards Visteon as both a customer and a competitor in that market.  *Id*. at 94:14-95:11, 114:2-15.

As a starting point, the Court acknowledges that "[a]ctual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty for those patent rights because such actual licenses most clearly reflect the economic value of the patented technology in the marketplace."  *LaserDynamics*, 694 F.3d at 79.  That being said, even licenses to the actual technology at issue must have been granted under circumstances "sufficiently comparable to the hypothetically negotiated license" being proffered in the litigation.  *Id*. at 80.  Or, if the circumstances are different, there must be evidence presented on which the jury can assess those differences and account for them in arriving at a reasonable royalty.  "[T]here must be a basis in fact to associate royalty rates used in prior licenses to particular hypothetical negotiations at issue in the case."  *Uniloc*, 632 F.3d at 1317.  "[C]omparisons of past patent licenses to the infringement must account for 'the technological and economic differences' between them."  *Wordtech*, 609 F.3d at 1320 (quoting *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 873 (Fed. Cir. 2010)).

"However, [the Federal Circuit has] never required identity of circumstances; on the contrary, [it has] long acknowledged that "any reasonable royalty analysis 'necessarily involves an element of approximation and uncertainty.'"  *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014) (quoting *Lucent*, 580 F.3d at 1325) (alterations added).  Thus, the Federal Circuit has "cautioned that 'district courts performing reasonable royalty calculations [must] exercise vigilance when considering past licenses to technologies *other* than the patent in suit,' *ResQNet*, 594 F.3d at 869, and "must account for differences in the technologies and economic circumstances of the contracting parties,' *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2010)."  *VirnetX*, 767 F.3d at 1330 (emphasis and alteration in the original).

17

In *VirnetX*, defendant Apple argued that the six licenses on which plaintiff's damages expert relied were not sufficiently comparable to the license that would have resulted from a hypothetical negotiation and that evidence of those licenses should have been excluded at trial.  767 F.3d at 1330. Much the same as Visteon argues here, Apple argued: (1) that certain of the licenses were temporally incomparable, as two predated the date of the hypothetical negotiation and three others were entered into three years after the date of the hypothetical negotiation, when the parties allegedly occupied very different bargaining positions, (2) that two of the licenses that related to the technology leading to the claimed invention also contained software licenses in addition to the various patents, and (3) one of the licenses covered 68 VirnetX patents, and was therefore much broader than the license to the four patents in suit that would have been the subject of a hypothetical negotiation.  *Id*.  The Federal Circuit concluded that the district court did not abuse its discretion in permitting plaintiff's damages expert to rely on the challenged licenses:

> To begin with, four of those licenses did indeed relate to the actual patents-in-suit, while the others were drawn to related technology. Moreover, all of the other differences that Apple complains of were presented to the jury, allowing the jury to fully evaluate the relevance of the licenses. *See* J.A. 1600, 1650, 1678–82. No more is required in these circumstances.
>
> Our case law does not compel a contrary result. In *ResQNet*, we faulted the district court for relying on licenses with "no relationship to the claimed invention," nor even a "discernible link to the claimed technology." 594 F.3d at 870. And in *Lucent*, we rejected reliance on licenses from "vastly different situation[s]" or where the subject matter of certain agreements was not even ascertainable from the evidence presented at trial. 580 F.3d at 1327–28. The licenses in this case—though not immune from challenge—bear a closer relationship to the hypothetical negotiation that would have occurred.
>
> This case is therefore much more akin to the circumstances in *Finjan [Inc. v. Secure Computing Corp.*, 626 F.3d 1197 (Fed. Cir. 2010)] *and ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*, 694 F.3d 1312 (Fed. Cir. 2012). In *Finjan*, there were several differences between the single license relied upon and the hypothetical negotiation, most notably that Finjan did not compete with the licensee as it did with

18

the defendant in the case, and that the license involved a lump sum rather than a running royalty. 626 F.3d at 1212. Nevertheless, we affirmed the damages award based on that license because "[those] differences permitted the jury to properly discount the . . . license." *Id*. And in *ActiveVideo*, the damages expert relied on two agreements, one of which post-dated the hypothetical negotiations by two years, did not involve the patents-in-suit, and did not cover the technologies in the case, while the other agreement covered both patents and software services. 694 F.3d at 1333. Nevertheless, we concluded that the "degree of comparability" of the license agreements was "[a] factual issue[ ] best addressed by cross examination and not by exclusion." *Id*. Similarly, here, though there were undoubtedly differences between the licenses at issue and the circumstances of the hypothetical negotiation, "[t]he jury was entitled to hear the expert testimony and decide for itself what to accept or reject." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010), *aff'd* —— U.S. ——, 131 S.Ct. 2238, 180 L.Ed.2d 131 (2011).

Thus, we do not believe the district court abused its discretion by permitting Weinstein's testimony regarding the proper royalty rate based on these allegedly comparable licenses.

767 F.3d at 1330-31.

Although the Horizon license involves, among others, the very patents in suit, Visteon argues that the comparability issues are nonetheless "radical" here and that Mr. Newell has failed to account for those differences in his opinion, giving the jury no basis on which to evaluate the relevance of the Horizon license.  Specifically, Visteon argues that Mr. Newell fails to account for: (1) the difference in scope between the licenses and intellectual property transferred as part of the Horizon asset purchase; (2) the change in the technology landscape in the two year time period between the 2002 Horizon deal and the 2004 hypothetical negotiation;[1] and (3) the economic differences, i.e. the bargaining positions, between Horizon and Visteon on the one hand and Visteon and Garmin on the other.

---

[1]  Because Visteon alleges that the hypothetical negotiation occurred *either* in 2004 or 2009, the experts have discussed two different possible time frames for the hypothetical negotiation in this case, some analyses focusing on the 2004 date and others on the 2009 time frame.

While Visteon no doubt raises some valid issues regarding complete comparability of the Horizon license, the facts here fall closer to the *VirnetX/Active Video* scenarios than they do to the *Lucent/ResQNet* scenarios.  Visteon will be able to place their arguments for lack of comparability before the jury which we be able to "fully evaluate the relevance of the licenses."  *VirnetX*, 767 F.3d at 1330.  First, it is undisputed that the Horizon license involved the exact patents in suit, among others.  According to Ms. White, the three remaining patents in suit were among the ten licenses that Visteon refused to transfer outright to Horizon.  Ms. White testified that Horizon tried to persuade Visteon to transfer ownership of the 10 patents listed in Annex 1.09, but Visteon refused.  This indicates that Visteon did see value in these patents and establishes that the very patents covered by the Horizon license are at issue in this case.

Second, Visteon argues in its motion to exclude the Horizon license that the parties' negotiating postures were incomparable to the positions that Visteon and Garmin would have occupied in a hypothetical negotiation because Horizon was unable to pay more than $1.5 million for the assets it acquired and because Horizon and Visteon were not competitors.  But Ms. White testified that Visteon set the price, refused to negotiate and offered Horizon a "take it or leave it" deal, suggesting that Visteon did get what it wanted from the deal.  Ms. White also testified that Horizon viewed Visteon as both a competitor and a customer.  In any event, as the Federal Circuit found in both *Finjan* and *VirnetX*, the fact that parties to a hypothetical negotiation did not share the same competitive relationship with regard to a prior license does not necessarily require exclusion and such a disparity can be adequately addressed through cross-examination.

Additionally, although more patents and software were included in the Horizon agreement than the patents in suit here, there can be no suggestion that Mr. Newell failed to disaggregate the

20

value fairly attributable to the patents in suit because Mr. Newell has conservatively adopted the *entire* $1.3 million of the Horizon deal that was attributed to *all* of the intellectual property transferred in the agreement as the basis for his reasonable royalty calculation. Thus, if anything, Mr. Newell's "valuation" based on the Horizon license is over-inclusive rather than under-inclusive.

Visteon next argues that the technology landscape changed so radically from 2002-2004 that a deal struck in 2002 bears little resemblance to one that would have been agreed to in 2004, the date of the hypothetical negotiation here. Mr. Newell's opinion contains extensive discussion of Garmin's perspective on the evolution in the technology market in this time frame. ECF No. 268-2, Newell Rebuttal Report ¶¶ 11-16. Visteon may have a different perspective, which it will be free to offer at trial. As the Federal Circuit recognized in *VirnetX*, Visteon will be free to argue this point to the jury, which will be fully capable of evaluating the differences and the similarities and deciding the weight to give the 2002 Horizon deal.

The Federal Circuit has established that "use of past patent licenses under [*Georgia-Pacific*] factors 1 and 2 must account for differences in the technologies and economic circumstances of the contracting parties." *Finjan*, 626 F.3d at 1211 (citing *ResQNet*, 594 F.3d at 870-73 and *Wordtech*, 609 F.3d at 1319-20) (alteration added). Here there is no difference in technology, i.e. each of the patents in suit was licensed as part of the Horizon license. As the Federal Circuit has recognized, "[a]ctual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty . . . ." *LaserDynamics*, 694 F.3d at 79. As Visteon recognized in its Reply, Mr. Newell and Garmin concede that there are some economic differences between the Horizon license and any license that would result from a hypothetical negotiation here and Mr. Newell's rebuttal report acknowledges those differences. For example, Mr. Newell "accounts" for the fact that the Horizon

license includes far more intellectual property than the patents in suit by allocating the entire $1.3 million to the four patents in suit.

The law does not require Garmin to demonstrate with any degree of mathematical or economic precision the impact that these differences would have on the value of a reasonable royalty.  As the Federal Circuit pointed out in *VirnetX:*

> We have held that in attempting to establish a reasonable royalty, the "licenses relied on by the patentee in proving damages [must be] sufficiently comparable to the hypothetical license at issue in suit." *Lucent*, 580 F.3d at 1325. "When relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice." *LaserDynamics*, 694 F.3d at 79. However, we have never required identity of circumstances; on the contrary, we have long acknowledged that "any reasonable royalty analysis 'necessarily involves an element of approximation and uncertainty.'" *Lucent*, 580 F.3d at 1325.

*VirnetX,* 767 F.3d at 1330.  Visteon relies on *Sprint Communs. Co. L.P. v. Comcast IP Holdings, LLC*, No. 12-1013, 2015 U.S. Dist. LEXIS 10838, at *6-7 (D. Del. Jan. 30, 2015) for the proposition that Mr. Newell must further "account" for or quantify the impact of these differences but that case addressed prior licenses that involved none of the patents in suit, were negotiated nine to thirteen years after the hypothetical negotiation, and resulted from litigation settlements about which no details were known.

Garmin and its expert, Mr. Newell, have acknowledged that there are certain differences between the Horizon license and any license to which the parties would have agreed in a hypothetical negotiation conducted in 2004.  Visteon cites no authority to support its contention that Mr. Newell must somehow quantify with some mathematical precision the impact of these differences to render this evidence reliable.  "At their core . . . [Visteon's] disagreements are with the conclusions reached by [Mr. Newell] and the factual assumptions and considerations underlying

22

those conclusions, not his methodology." *ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012). These issues "are factual issues best addressed by cross examination and not by exclusion." *Id.*

For these reasons, the Court DENIES Visteon's motion to exclude evidence of the Visteon-Horizon license.

### C.   Visteon's *Daubert* Motion to Exclude Michael C. Newell From Offering Any Damages Testimony on Behalf of Garmin

In this motion, Visteon aims to preclude Garmin's expert, Michael C. Newell, from offering any opinion in this case regarding a reasonable royalty to which Garmin and Visteon hypothetically may have agreed prior to any alleged infringement. Specifically, Visteon asserts that Mr. Newell has relied on five allegedly comparable licensing agreements, but has failed to adequately account for the differences between those agreements and a hypothetical agreement that may have occurred between Visteon and Garmin, rendering his entire methodology "fatally flawed." Two of those agreements, the Alston Bird Agreement and the Visteon-Horizon Agreement, have been discussed above. The remaining three agreements on which Mr. Newell relies as additional "data points" in his reasonable royalty analysis are: (1) a 2010 Visteon-TomTom agreement pursuant to which Visteon granted a license to 14 U.S. patents to TomTom, including the patents in suit, for a lump sum payment; (2) a 2011 Visteon-MiTAC agreement pursuant to which Visteon granted MiTAC a license to each of the four patents for a lump sum and running royalties; and (3) a 2009 Garmin-Trimble agreement, pursuant to which Garmin licensed from Trimble an "eco-routing" feature for a $0.10/unit running royalty.

Garmin points out that the $4 million lump sum payment pursuant to the TomTom license covers not just the patents in suit but nine additional patents and that the term of the license is longer

than any term that would have been contemplated in a hypothetical negotiation, "differences" that would tend to overstate the value of the patents in suit, not the opposite, and "differences" that Mr. Newell acknowledges.   In any event, for the reasons discussed above at length regarding the Visteon-Horizon agreement, the Court concludes that the TomTom license, although admittedly marked by differences from any agreement that Visteon and Garmin would have reached on the date of the hypothetical negotiation,  relates to the very patents in suit and is therefore of significant probative value in assessing what the parties would have agreed to in a hypothetical negotiation. Mr. Newell acknowledged that the TomTom license was longer in duration and more comprehensive in scope, and Mr. Newell expressly accounted for these differences and explained his decision to prorate the TomTom royalty rate across all patents and then to apply that rate to the accused features, resulting in his $1.6 million hypothetically negotiated reasonable royalty.  ECF No. 228-2, Newell Rep. ¶¶ 75, 77; Newell Dep. 295:19-297:5.  Visteon's claim that Mr. Newell has failed to account for the economic value of the patents in suit does not require exclusion of evidence of the TomTom agreement and can be asserted through cross examination.

Similarly, the MiTAC agreement involves just the patents in suit and again Mr. Newell acknowledged and expressly accounted for the distinguishing facts that the MiTAC license was the result of a settlement to resolve ongoing litigation and for the fact that the parties stood in different negotiating postures than Visteon and Garmin.  Mr. Newell conceded that the MiTAC agreement, consequently, was "less informative" than some of his other data points.  ECF No. 268-2, Newell Report ¶¶ 59, 63 n. 130.  On the one hand Visteon criticizes Mr. Newell for failing to account for these differences and on the other challenges his methodology as flawed precisely because he has acknowledged them.  Even Visteon relied on the MiTAC license at one point in this litigation "as

24

part of its proof as to what a reasonable royalty would be as applied to Garmin," as did Visteon's damages expert, Peter Smith, when seeking a "sanity check" for his reasonable royalty calculation. Garmin's Resp. Ex. OO, Visteon's Third Supplemental Response to Interrogatory No. 3; ECF No. 268-4, Smith Dep. 134:20-24.

Visteon complains that Mr. Newell's *Georgia Pacific* analysis resulted in too many determinations of a neutral impact on his analysis and that his conclusions are just "the *ipse dixit* of an expert." To support its "*ipse dixit*" argument, Visteon relies on *TASER Int'l , Inc. v. Karbon Arms, LLC*, 6 F. Supp. 3d 510, 521 (D. Del. 2013), but in fact that published opinion is entirely directed to the issue of infringement and has nothing to do with exclusion of expert testimony on the issue of calculating reasonable royalty. The Court did locate a case, *TASER Int'l, Inc. v. Karbon Arms, LLC*, No. 11-426, 2013 WL 6773663 (D. Del. Dec. 19, 2013), which is a two-paragraph unpublished opinion in which the court did exclude an expert's opinion as the "quintessential *ipse dixit* justification," because the expert gave no explanation for the relevance of the "numbers" on which he relied, i.e. a CEO's unsupported statement of what an appropriate royalty rate would be and certain R&D costs of both the plaintiff and the defendant, in reaching his reasonable royalty figure. Neither *TASER* opinion is persuasive here.

Here, the licenses involved the very patents in suit, one agreement involved nine patents in addition to those in suit and the other involved just the patents in suit. Mr. Newell explained his basis for choosing these agreements, acknowledged their differences and explained how his opinion was influenced by his consideration of the *Georgia Pacific* factors – often concluding that the impact of that analysis was neutral. The fact remains that Mr. Newell did consider the factors and did arrive at a judgment as to the impact of those factors. Newell Dep. 207:21-210:1. Visteon may disagree

with Mr. Newell's conclusion or think them too superficial, and may place a different value on the impact of these distinctions or may choose to focus on other distinguishing features, and will be eentitled to do so on cross-examination.  As discussed at length above, this is all that is required for this Court to permit evidence of these agreements, each of which admittedly involved the very patents in suit, to be presented to the jury.[2]  "At their core . . . [Visteon's] disagreements are with the conclusions reached by [Mr. Newell] and the factual assumptions and considerations underlying those conclusions, not his methodology." *ActiveVideo*, 694 F.3d at 1333.  These issues "are factual issues best addressed by cross examination and not by exclusion." *Id*.  No more is required for the Court to permit evidence regarding the TomTom (involving each of the patents in suit and nine additional patents) and MiTAC (involving just the patents in suit) agreements to pass through the *Daubert* gate.  *Finjan*, 626 F.3d at 1211.

---

[2] The Court also finds unpersuasive in the present context the "standard essential patent"(SEP) cases on which Visteon relies, which involve large pools of patents that claim an invention that is essential to compliance with technical standards and are therefore subject to compulsory licensing requirements.  Special rules apply in these cases, including required commitments to fair, reasonable, and nondiscriminatory licensing ("FRAND"), none of which are instructive here.  *See, e.g.*, *Microsoft Corp. v. Motorola, Inc.*, No. 10-cv-1823, 2013 WL 2111217, at *3 (W.D. Wash. April 25, 2013) ("[I]n order for a company to practice the standard, it is necessary for that company to utilize technology that is covered by one or more patents. Patents that are essential to the standard (in that they must be practiced to accomplish the standard) are called standard essential patents, or "SEPs." The existence of SEPs is a common problem in the world of technology standards. To deal with this problem, SSOs have devised a solution. To make it easier for companies to practice their standards, SSOs seek commitments from the owners of SEPs to license their patents to standard-users on RAND terms.")  Courts addressing SEPs invoke a "modified" *Georgia-Pacific* analysis in which the parties to the hypothetical negotiation "would set RAND royalty rates by looking at the importance of the SEPs to the standard and the importance of the standard and the SEPs to the products at issue." *Id*.  No SEPs or patent pools are involved in this case and the Court finds the SEP cases relied on by Visteon unhelpful. As discussed above, Mr. Newell does address what he concludes is a universality among the patents in suit which he opines supports his equal allocation of value among them.  Newell Report ¶ 77.  This very claim, i.e. that the reasonable royalty calculation failed to disaggregate the value of those aspects of the license not attributable to the patents in suit, was considered and rejected by the court in *ActiveVideo*.  694 F.3d at 1333. There, as here, such disagreements go to the weight of Mr. Newell's testimony, not its admissibility.

Finally, Visteon challenges Mr. Newell's reliance on the Trimble license that Garmin secured for a patent feature that is similar, according to Garmin, to the features of the '060 patent. Garmin responds that Mr. Newell does not rely on the Trimble license to establish a reasonable royalty but rather points to the Trimble license to demonstrate how Garmin was likely to approach any hypothetical negotiation for a license to a patented feature. In other words, Garmin contends Mr. Newell viewed the Trimble license as instructive on Garmin's overall approach to licensing arrangements, not on establishing the amount of a reasonable royalty. Resp. 15-16. Visteon does not reply to this distinction and the Court will permit evidence of the Trimble license for this limited purpose, which Visteon will be free to dispute on cross examination.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS Visteon's motion to exclude evidence of the Visteon-Alston Bird Agreement, DENIES Visteon's motion to exclude evidence of the Visteon-Horizon Agreement and DENIES Visteon's *Daubert* motion to exclude Michael Newell from offering any damages testimony.

IT IS SO ORDERED.

s/Paul D. Borman           
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  September 12, 2016

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 12, 2016.

s/Deborah Tofil             
Case Manager
