UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VISTEON GLOBAL TECHNOLOGIES, INC.
AND VISTEON TECHNOLOGIES, LLC,

|  |  |
|---|---|
| Plaintiffs, | Case No. 10-cv-10578 |
|  |  |
|  | Paul D. Borman |
| v. | United States District Court |
|  |  |
|  | David R. Grand |
| GARMIN INTERNATIONAL, INC., | United States Magistrate Judge |
|  |  |
| Defendant. | |

_____/

OPINION AND ORDER
(1) GRANTING GARMIN'S MOTION TO EXCLUDE DR. JOEL STECKEL'S CONJOINT
SURVEY AND CONCLUSIONS DERIVED THEREFROM (ECF NO. 259) and
(2) GRANTING GARMIN'S MOTION TO EXCLUDE PETER SMITH'S REASONABLE
ROYALTY CALCULATIONS AND OPINIONS REGARDING DAMAGES (ECF NO. 260);
(3) GRANTING GARMIN'S MOTION
TO STRIKE DR. STECKEL'S DECLARATION (ECF NO. 318);
(4) GRANTING GARMIN'S MOTION TO STRIKE PORTIONS OF
PETER SMITH'S EXPERT REPORT (ECF NO. 342); and
(5) GRANTING VISTEON'S *DAUBERT* MOTION TO EXCLUDE JOHN LAVRAKAS
FROM OFFERING ANY TESTIMONY REBUTTING SURVEY (ECF NO. 255)

In this patent infringement action, Defendant Garmin International, Inc.'s ("Garmin") has

moved to exclude the expert opinions of Plaintiffs Visteon Global Technologies, Inc. and Visteon

Technologies, LLC's ("Visteon") damages experts Dr. Joel Steckel and Mr. Peter Smith. (ECF Nos.

259, 260.) Visteon has filed Responses to both motions (ECF Nos. 280, 281) and Garmin has filed

Replies (ECF Nos. 319, 320). The Court held a *Daubert*[1] hearing on July 13, 2016, and heard

testimony from both Dr. Steckel and Mr. Smith. The parties filed post-hearing briefs on August 12,

_____
[1] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

1

2016.  (ECF Nos. 376, 377.)[2]

## I.    BACKGROUND

This is an action for patent infringement.  In the claims that remain for trial, Visteon Global contends that Garmin infringes, either directly or indirectly, U.S. Patent No. 5,544,060 ("the '060 patent"), U.S. Patent No. 5,654,892 ("the '892 patent") and U.S. Patent No. 5,832,408 ("the '408 patent").  In general, the '060 patent is directed to a method of navigating a vehicle whereby a user can generate an optimal path and then switch to an alternate navigation path before beginning on the optimal path.  Visteon contends that Garmin directly infringes Claims 3, 4, and 6 and indirectly infringes Claim 3 of the '060 patent.  In general, the '892 patent is directed to a method for assisting the navigation of a vehicle whereby a complex arrow icon is generated and displayed to the driver at a predetermined time or distance before the driver reaches a particular maneuver.  Visteon contends that Garmin directly and indirectly infringes Claim 8 of the '892 patent. In general, the '408 patent is directed to a navigation system which allows the user to search for a destination either from a list of categories or from an alphanumeric search.  Visteon contends that Garmin directly and indirectly infringes Claims 4 and 5 of the '408 patent.

Visteon contends that a variety of Garmin navigation products ("the accused products") infringe one or more the asserted claims literally and under the doctrine of equivalents.  Visteon contends that Garmin directly infringes, actively induces infringement and/or contributorily infringes one or more of the asserted claims of the asserted patents, and that Garmin's infringement is and has been willful.  Visteon seeks damages in the form of a reasonable royalty for Garmin's

---

[2]  The Court's resolution of these motions, as explained in the Court's closing footnote, resolves several other pending motions, specifically ECF Nos. 255, 318 and 342, as discussed further *infra* at footnote 10.

alleged infringement.  Visteon also seeks prejudgment interest, enhanced damages, attorneys' fees, and costs, including without limitation any fees and costs associated with participating in multiple *ex parte* proceedings at the United States Patent and Trademark Office ("USPTO") as initiated by Garmin in this action.  Garmin denies that it directly, indirectly or contributorily infringed or induced infringement of any of the patents in suit and affirmatively asserts a host of invalidity defenses.  Garmin seeks judgment in its favor and requests that it be awarded its costs and reasonable attorneys' fees incurred in defending against Visteon Complaint.

With respect to Dr. Steckel, Garmin attacks the "scientific adequacy" of Dr. Steckel's survey, challenging aspects of the underlying design of the survey and the analysis that Dr. Steckel employed in analyzing the data that he collected.  Garmin levels three principal attacks on the reliability of Dr. Steckel's methods as applied in this case and to his conclusions, which Garmin argues resulted in inflated values of the accused features "far beyond any semblance of real-world credibility."  Garmin argues that the survey produced "economically irrational results," attributable to at least the following fundamental flaws: First, Garmin argues that Dr. Steckel did not survey the actual patented functionalities but rather tested features much broader than the accused features, leading to an overvaluation of the patented features.  Second, Garmin argues that Dr. Steckel failed to include reasonable distracter features in his product profiles, thus inordinately focusing respondents on the patented features.  And third, Garmin argues that Visteon improperly extrapolates from Dr. Steckel's "economic values" to support their reasonable royalty damage calculation.

With respect to Mr. Smith, Garmin levels three principal attacks on his reasonable royalty calculation: (1) Mr. Smith's reliance on Dr. Steckel's Economic Values fails to apportion revenue to the individual allegedly infringing features (as distinct from the multitude of non-patented features

in the accused devices); (2) Mr. Smith failed to properly apply the *Georgia-Pacific* analysis; and (3) Mr. Smith failed to explain the methodology he applied to reach his final royalty calculation that was revised to account for Dr. Steckel's own revision to his Economic Values.

### A.       Dr. Steckel's Conjoint Study

Visteon's survey expert, Dr. Joel Steckel, is a Professor of Marketing at the Stern School of Business, New York University, where he is the Vice Dean of Doctoral Education. Dr. Steckel received his B.A. from Columbia University and his M.B.A., M.A., and Ph.D degrees from the Wharton School, University of Pennsylvania.  Dr. Steckel has visiting or permanent faculty appointments at the Columbia University Graduate School of Business, the Anderson Graduate School of Management, U.C.L.A., the Yale University School of Management and the University of Pennsylvania Wharton School.  (ECF No. 268, Garmin Index of Exhibits, Ex. E, 11/30/12 Revised Report of Joel Steckel, Ph.D ¶ 1).  ("11/30/12 Steckel Report").  Dr. Steckel's fields of specialization include marketing strategy, marketing research, and consumer decision-making.  Dr. Steckel has taught M.B.A. students about, written textbook chapters on, and lectured executives on conjoint analysis.  *Id.* ¶ 3.  At the *Daubert* hearing, Dr. Steckel first testified that this was the first time he had performed a conjoint analysis in a patent matter, but later at the hearing recalled having done a conjoint study in one other patent case that never went to trial.   (ECF No. 386, Sealed Transcript of July 13, 2016 *Daubert* Hearing at 37:24-38:13.)

Dr. Steckel conducted a choice-based conjoint ("CBC") consumer survey on behalf of Visteon to attempt to determine the value that consumers place on the individual accused patented

features.[3]   Conjoint analysis "is based on the notion that consumers will "*consider jointly*" the attributes or characteristics of a product when making their purchasing decisions."  Steckel Report ¶ 36 (emphasis in original).  V. Seenu Srinivasan, a tenured Professor Emeritus at the Stanford Graduate School of Business, and an acknowledged "father of conjoint analysis," explained the survey-based research approach as reported in *TV Interactive Data Corp. v. Sony Corp*., 929 F. Supp. 2d 1006 (N.D. Cal. 2013):

> Professor Srinivasan describes conjoint analysis as a type of survey or market research, which, at the most general level, conceptualizes products as bundles of attributes, treating price as an attribute. [Declaration of Professor V. Seenu Srinivasan]. ¶ 3. Conjoint analysis uses customer surveys to determine "values" for each attribute. By choosing among multiple bundles of attributes, survey participants make implicit tradeoffs one would make in real-world purchasing decisions. *Id*. "For example, conjoint analysis offers respondents hypothetical products in several combinations, some of which might contain feature 1 (but not feature 2), and some of which might contain feature 2 (but not feature 1)." *Id*. Professor Srinivasan explains that by comparing respondents' choices when presented with different features, one can estimate the quantitative values of specific features. *Id*. According to Professor Srinivasan, studies have validated that this implicit tradeoff is more reliable than asking consumers directly what they would pay for a specific feature. *Id*.

929 F. Supp. 2d at 1020.

Dr. Steckel's conjoint study was a web-based study that respondents took on their desktop or laptop computers.  *Id*. ¶ 42.  Dr. Steckel worked with a professional survey firm, Applied Marketing Science ("AMS"), that implemented the survey under Dr. Steckel's direction.  *Id*. ¶ 10.

---

[3] Dr. Steckel designed and conducted two studies for Visteon.  One to measure the extent to which owners of Garmin GPS systems used the patented features ("the usage survey") and the other to determine the economic value, if any, that GPS owners attach to the patented features ("the conjoint survey").  ECF No. 268, Garmin Index of Exhibits, Ex. E, 11/30/12 Revised Report of Joel Steckel, Ph.D ¶ 8.  ("Steckel Report").  Only the conjoint survey is challenged in the motions addressed in this Opinion and Order.  Garmin challenges Dr. Steckel's usage survey in a separate motion *in limine* that will be addressed in a separate Opinion and Order.

A conjoint survey typically asks study participants to compare a number of product profiles to determine a relative value that the consumer attaches to a particular, individual feature or attribute. "By capitalizing on respondents' joint consideration of the various attributes for specified products, the research is then able to analyze the response data to evaluate consumer preferences and relative valuations for individual product attributes, combinations of product attributes, and particular products." *Id*. ¶ 36.   A respondent in a conjoint consumer survey is asked to choose from among a "choice set" of products, with each choice set described by profiles of bundled attributes. *Id*. ¶ 37. For example, a conjoint exercise involving bottled water might contain attributes such as flavor, label color, carbonation and bottle shape.   Each attribute would be further defined by a set of characteristics known as "levels," for example the flavor attribute would have multiple mutually exclusive possible levels, such as lemon, lime, and orange. *Id*.

Dr. Steckel selected six attributes to define the GPS product profiles shown to respondents in the conjoint survey: a. Points of Interest (the '408 patent), b. Special Designation Selection (the '375 patent), c. Preview and Route Adjustment (the '060 patent), d. Turn Preview Display (the '892 patent), e. Language Display and f. Price. *Id*. ¶ 38.   Attributes a, b, c, and d are related to the patented features, attribute e is a "distracter," and attribute f allows a measurement of value associated with all of the other attributes. *Id*. Each attribute, with the exception of price, is defined by two levels. *Id*. ¶ 39.   A sample three-product profile choice task would look like this:



Having price as one of the attributes "allows for the measurement of an economic value for each patented feature relative to appropriate reference points." *Id*. ¶ 40. Dr. Steckel utilized three device product profiles per choice task and in each instance asked the respondent to select the device that they would be most likely to purchase. *Id*. ¶ 43. Respondents were shown a total of 16 choice tasks to complete the survey. *Id*.

Based on the respondent's selections from the choice sets, Dr. Steckel applied a well established statistical analysis, utilizing the multinomial logit model employing Hierarchical Bayes ("HB") estimates, to determine the separate value, or "partworth," that consumers attach to each product attribute. *Id*. ¶¶ 44-45. Partworths reflect how much each attribute contributes to the overall consumer preference for a product (here a feature) and allow the researcher to assess the relative importance of attributes by examining the ranges of partworths. *Id*. ¶ 44. The partworths allow an assessment of the importance of the features described by the attributes in consumer purchasing

decisions and allow an evaluation of the willingness of the consumer to trade off features against price. *Id*. ¶ 45. Dr. Steckel used the partworths on price and the attributes to estimate the extent of these tradeoffs for each of the patented features, resulting in an "economic value" or "EV" for the patented feature relative to the closest allegedly non-infringing alternative. *Id*. ¶ 46.

All of the respondents to the conjoint survey were recruited through Survey Sampling International ("SSI"), a company that pre-recruits potential respondents who have indicated a willingness to participate in such market research surveys. *Id*. at ¶ 18. SSI respondents were invited to take the survey based on their profile and demographics. *Id*. at ¶ 19. Several controls were in place to ensure that only invited respondents could respond, that each respondent could only complete the survey one time and that the respondent's stated age and gender matched their profile in the SSI database. *Id*. Forty respondents to the conjoint survey were excluded because their age and gender did not match the SSI database profile. *Id*. ¶ 49. A total of 737 invited respondents qualified to participate and, out of those 737, 588 respondents completed the conjoint survey between May 7 and 11, 2012. *Id*. ¶ 50. The initial results from the 588 respondents who completed the survey were screened for basic unreliability, such as completing the survey too quickly or too slowly or with straight-line responses that demonstrate insufficient attention to the survey. *Id*. ¶ 52. There were 546 respondents in the final sample set and they took an average of 27.3 minutes to complete the survey. *Id*.

In designing the survey, Dr. Steckel undertook two levels of exploratory research to determine the efficacy of the design. First, AMS interviewed 15 GPS users to determine an appropriate vocabulary for the questionnaire based on the words and phrases commonly used by consumers. In a second round of exploratory research, AMS interviewed 25 GPS users to ensure

that the survey set forth the closest allegedly non-infringing attribute alternative. *Id.* ¶55(a). In making the final selection of non-infringing alternatives to include in the survey, Dr. Steckel was informed by the results of his exploratory research and also was assisted by counsel for Visteon. ECF No. 268, Garmin Index of Exhibits, Ex. F, 11/20/12 Deposition of Dr. Joel Steckel 138:25-139:7. None of the individuals who participated in the exploratory research were asked to complete the conjoint survey. Steckel Report ¶ 55(a)(iii). Before going live with the conjoint survey, Dr. Steckel conducted a web-based pretest of 10 GPS consumers who were debriefed after they completed survey. *Id.* ¶ 55(b). The survey presented video depictions of the attributes and levels, utilizing voice-over, animation and accompanying text to enhance visual explanations. *Id.* ¶ 55(c).

Before beginning each choice task, respondents were given descriptions of each of the attributes and levels through general text descriptions, video animations and charts describing the various options that respondents would see in the upcoming choice task. Steckel Report ¶ 56. Each respondent was then given 16 separate choice tasks, each task consisting of three different GPS devices with various attributes and levels within those attributes, and were told to select the device that they would be most likely to purchase and to assume that they must purchase one, i.e. there was not a "no-purchase" option. Steckel Report ¶¶ 57, 58; Steckel Report Ex. H-19. Respondents were told to assume that aside from the attributes identified in the choice sets, the devices were otherwise equal.

Dr. Steckel used the data generated by the respondents across all of their choice tasks to estimate the partworths, i.e. the value that respondents placed on each of the levels within each attribute. Steckel Report ¶ 59. Dr. Steckel used software developed by Sawtooth Software, Inc. to obtain individual respondent-level HB estimates of the partworths. The partworths generated by the

HB method are measured in units of consumer utility – if a consumer's utility for attribute level A is greater than that of attribute level B, then that consumer prefers attribute level A to attribute level B, all else being equal. *Id.* In obtaining the HB estimates, Dr. Steckel constrained the partworths on the price attribute for each respondent to be monotonic, i.e. his analysis imposed the reasonable economic assumption that individuals prefer paying a lower price for a product than a higher price for that same product. *Id.* ¶ 60.[4]

Dr. Steckel's conjoint survey results indicated that the mean partworth on the attribute level relating to the patented feature was greater in the case of each of the patented attributes than the partworth on the level associated with the non-infringing alternative for that attribute. Steckel Report ¶¶ 63, 64. Dr. Steckel used the respondent-level partworths on price and the other attributes to estimate the EV of the patented features by expressing in "units of utility" as a percentage of a reference price. *Id.* ¶ 66. Dr. Steckel performed this EV calculation for each respondent for each of the patented features and then computed a simple mean EV for the presence of the patented

---

[4] Although Dr. Steckel testified in his original deposition that he had applied a price constraint when submitting his original report, it became clear under questioning that he had inadvertently failed to do so. Dr. Steckel's Revised Report (his 11/30/12 Report) purportedly corrected the absence of constraints with respect to price monotonicity. *See* ECF No. 268, Garmin's Index of Exhibits, Exhibit I, Jan. 13, 2013 Deposition of Dr. Joel Steckel 298:20-300:4. Dr. Steckel also decided, as long as he was going back to his spreadsheet to apply the price constraint, to revisit some of the other decisions he had made, such as the original decision to bound the values from above at 20 but not to bound them below. Steckel Dep. 309:4-310:19. Thus, in his Revised Report, Dr. Steckel applied a lower bound of zero, thus excluding the negative economic values for an attribute (which indicated the irrational proposition that someone would have to be paid to accept the attribute). *Id.* at 309:15-311:4. Dr. Steckel testified that alternatively, the bounds on both ends could be ignored and a median of the raw data could be taken, which would have the same effect as bounding, i.e. to eliminate the outliers, which would result in higher economic values. *Id.* at 311:5-312:11. The revised Steckel calculations had the effect that a respondent could not value a non-infringing alternative more than the patented feature. *Id.* at 320:1-20. Dr. Steckel testified that applying this upward bound is a "completely accepted practice" in conjoint analysis. *Id.* at 331:2-4.

feature versus its absence.  This computation yielded the following results: "Respondents indicated that they are willing to pay, on average, $13.93 for the presence of the Points of Interest Feature ('408 patent), $14.48 for the Preview and Route Adjustment Feature ('060 patent), $11.86 for the Special Destination Selection Feature ('375 patent), and $10.41 for the Turn Preview Display feature ('892 patent).  *Id.* 68.

Despite using the term "willingness to pay" in his Report, Dr. Steckel emphasized that his economic values do not represent the actual amounts that consumers would be willing to pay for inclusion of the patented features in a competitive market.  *Id.* ¶ 69.  Dr. Steckel expressly stated that "it would be incorrect to suggest that these four patented features alone are responsible for $50.68 of the price of a GPS system."  *Id.*  Dr. Steckel confirmed this understanding of his economic values at the *Daubert* hearing, testifying expressly that "the Economic Values do not reflect what a consumer would be willing to pay for the attribute in the marketplace necessarily."  *Daubert* Tr. 24:22-23.)  "Q: Did you take any steps as part of your survey analysis to determine the price of these features in the actual marketplace?  A: I did not."  *Daubert* Tr. 24:24-25:1.

Responding to the Court's inquiry as to why he elected to use only one relatively unimportant distracter feature, i.e. language, in his study, Dr. Steckel explained that it was unnecessary for purposes of his study to determine the actual value of the patented features to consumers in relation to the many other non-patented features of the accused devices:

> I don't need to create the real world, completely real world trade-offs for my purposes, for the purposes of the Study.  If I were trying to project consumer choices, so how market share might have been adjusted but for the incorporation of the patent features, then [mulitple distracters] would have been really important, then they would have been critical.  I believe in those cases if that were my goal, Garmin's criticisms would be appropriate.  However, that was not my goal.  I am just trying to create the trade-offs between the particular features and money without projecting to real world choices.  So I think the short answer to your question is I wasn't trying

11

> to project to real world choices – I don't need to for purposes of the Study as I described them.

*Daubert* Tr. 37:5-14 (alteration added).[5]  Dr. Steckel does suggest that the economic values do provide an indication that in general the patented features are of significant value to consumers and that not all GPS features are valued equally by consumers.  Smith Report ¶ 69.

Visteon's pre and post-*Daubert* hearing briefing makes clear, and it is undisputed, that Dr. Steckel's study did not attempt to determine a real world price for the four patented features, and did not endeavor to value any non-patented features or to determine the value of the four patented features relative to the multitude of non-patented features in the accused devices:  "Garmin correctly posits that '[c]onjoint surveys, when done properly, are useful for determining the **relative** value of one feature to other tested features.'"  (ECF No. 280, Visteon's Resp. to Garmin's Mot. to Exclude Smith 5 ("Smith Resp. Br.")  (Emphasis and alteration in original).  The only tested features in Dr. Steckel's study, apart from the unimportant language distracter, were the four patented features.

---

[5] Garmin attacks several aspects of Dr. Steckel's methodology that the Court need not address given Visteon's concession that Dr. Steckel attempted to apportion the value only of the four patented features relative to each other and not relative to the many important non-patented features of the accused devices.  Had Garmin attempted to rely on Dr. Steckel's study as a basis to apportion value between the patented and non-patented features of the accused devices, there would have been legitimate challenges to his work.  For example, Dr. Steckel's study failed to demonstrate any principled basis for selecting language as the sole distracter feature, such as a phased study that would have determined in a preliminary stage how consumers valued or ranked the patented features relative to other important features of the accused devices, *see, e.g., TV Interactive*, 929 F. Supp. 2d at 1021 (Professor Srinavasan performed a preliminary phase of his study that "asked respondents to prioritize 18 attributes of each accused product to come up with a list of six attributes that have similar values as the [accused] features") (alteration added); *Oracle America, Inc. v. Google Inc.*, No. 10-03561, 2012 WL 850705, at * 10 (N.D. Cal. March 13, 2012) (excluding expert's conjoint study where "the features selected to be surveyed, only seven in total, were purposely few in number and omitted important features that would have played an important role in real-world consumers' preferences").  Additionally, as Dr. Steckel noted himself, any conjoint study that attempted to capture real world values would necessarily have to include a no-purchase option.

Thus, the only "value" expressed in Dr. Steckel's economic values is the relative value of the four asserted patented features to one another. Dr. Steckel's conjoint results express nothing about the value of the four patented features relative to other important features of the accused devices. "Dr. Steckel's conjoint analysis was used for one (and only one) purpose by Mr. Smith – to apportion the value of the patented features *relative to each other*." (ECF No. 376, Visteon's *Post-Daubert* Hearing Brief 1.) (Emphasis in original). To emphasize this point, Visteon quotes the following from paragraph 69 of Dr. Steckel's Report, portions of which were quoted above:

> It is important to recognize that these values do not represent the actual amounts consumers would be willing pay for the inclusion of the patented features in a competitive market. It would be incorrect to suggest that these four patented features alone are responsible for $50.68 of the price of a GPS system. Price is primarily determined by three factors: **consumer value, producer costs, and competition. I studied only one, consumer value**.

Smith Resp. Br. 5 (emphasis in original).

As discussed at length *infra*, it is Visteon's burden in this case to tie its reasonable royalty damage calculation to the actual incremental value of the patented features in the real world marketplace, i.e. to establish the incremental profit that Garmin could have expected to earn from incorporating the patented technology in these four patents into their PNDs at the time of a hypothetical negotiation. Visteon concedes that Dr. Steckel did not attempt to do this but claims that it has satisfied this burden through additional expert evidence provided by Mr. Peter Smith, whose opinion builds on Dr. Steckel's work:

> [P]rice (or actual value apportioned to the patents-in-suit) can be determined when the Economic Values are combined with *producer costs* and *competition*. With this in mind, Mr. Smith picked up where Dr. Steckel's analysis left off, and provided the two other elements of the price calculation via *Georgia-Pacific* analysis and Garmin's target profit margin: producer costs and competition. . . . Garmin's target profit margin directly accounts for its royalty and hardware costs (*producer costs*) and was derived by Mr. Smith as a first multiplier to begin to transform the

> Economic Values from the theoretical consumer values to the prices attributable to the patents-in-suit.  The next factor was derived from Mr. Smith's *Georgia-Pacific* analysis which considers, among other things, *competition* in the industry. . . . Mr. Smith's analysis is solidly based on a reliable methodology for attributing value to the patented features, and thus complies with the Court's apportionment requirement. Contrary to Garmin's assertion that "Mr. Smith did not take any additional steps" to apportion, Mr. Smith's analysis completes the apportionment process started by Dr. Steckel to assign value to each of the patented features.

Smith Resp. Br. 5-7 (emphasis in original).

### B.      Mr. Smith's Reasonable Royalty Calculations

Following a finding of infringement, "the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."  35 U.S.C. § 284.  "The most common method for determining a reasonable royalty is the hypothetical negotiation approach, which 'attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began.'"  *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) (quoting *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009)). Utilizing the hypothetical negotiation approach, Peter Smith offers four separate reasonable royalty calculations: (1) "use Lane Guidance and Turn Preview as a royalty value proxy;" (2) "use the Steckel part-worths to calculate potential royalties directly;" (3) "develop a Total Available Margin estimate;" and (4) "use the Mitac Settlement."  ECF No. 268, Garmin Index of Exhibits, Exhibit M, 9/28/12 Expert Report of Peter Smith 30-31 ("the Smith Report").  In this motion, Garmin focuses solely on method two, the calculation that relies on the use of Dr. Steckel's Economic Values, which Mr. Smith describes as follows:

> In this case, I took the partworths developed by Dr. Steckel, and applied a discount factor to account for the relative negotiating strength of Visteon, as shown in my development of the *Georgia-Pacific* (Exhibits 10 and 11) factors in this case.  That

> discount, either 0.4000 (Exhibit 10) or 0.568 (Exhibit 11), is based upon the ratio of 2.00/5.00 (Exhibit 10) or 2.84/5.00 (Exhibit 11). It is applied to an adjusted royalty number developed by assuming a target margin to be received by Garmin for the incorporated features that will yield a total margin equal to the actual 63.89% gross margin received during the infringement period on sales of automotive PND products. The estimated royalty for each patent, and the estimated total royalty ($4.94, using the results of Exhibit 10) to be paid for the four patents-in-suit is shown in Exhibit 1[9].

Smith Report 30.[6] (Alteration/correction added; *see also* Steckel Dep. 225:3-8).

Mr. Smith states that he has read Dr. Steckel's conjoint study and that it "successfully identified significant economic value in the patents-in-suit, and can be relied upon as a partial basis for developing a reasonable royalty estimate for use in calculating economic damages for use by the court in the event that it is found Defendant Garmin has infringed the patents in suit with its PND products." ECF No. 268, Exhibit D, Nov. 13, 2012 Deposition of Peter Smith 54:21-56:8. Mr. Smith confirmed that Dr. Steckel calculated the consumer value of the accused features only and did not undertake to determine the value of all features of the accused devices, which includes a multitude of features that were not subject to challenge in this case:

> Q: Did Dr. Steckel calculate the total consumer value of all features of personal navigation devices?
>
> A: I believe he only talked about the patented features in his calculations; and again, in paragraph 69, that is indicated directly.
>
> Q: Okay. So is that correct then, Dr. Steckel did not calculate the total consumer value of all features, including non patented features of personal navigation devices?
>
> A: To my knowledge, he didn't and certainly his report doesn't say that.
>
>             *           *           *

---

[6] Mr. Smith appears here to use the terms "part-worths" and "Economic Values" interchangeably. Steckel Dep. 224:18-22.

Q: [B]ut Dr. Steckel did not determine a parts-worths (sic) value for all of the non-patented features and functionalities in the PNDS?

A: That was not the objective of his study, so I'm fairly certain he didn't.

Smith Dep. 65:9-25, 167:8-12.

Mr. Smith explained that he contacted Dr. Steckel specifically to discuss his understanding

of ¶ 69 of Dr. Steckel's Report:

Q: I believe you said you wanted to confirm this disclaimer by Dr. Steckel in paragraph 69 of his report, is that right?

A: Yes.

Q: You wanted to confirm your understanding of paragraph 69 of his report?

A: I wanted to understand his disclaimer as accurately as I could, yes, and I might add it was because I fully agreed with it. I thought, but I sure didn't want to go off in a direction that he would not be comfortable with.

Q: And why did you want to make sure that he would be comfortable with the direction you were taking with the part-worth numbers?

A: Well, he's one of the country's, if not the world's, leading expert in the employment of conjoint analysis. I'm at best a layman, although I've used the technique. I certainly understand it statistically, but he's got vastly more experience in how these outcomes are to be used and where the pitfalls are. So I wanted to be sure I didn't say something that would cause my words to impugn his work.

Smith Dep. 60:12-61:11.

Mr. Smith further explained the details of his conversation with Dr. Steckel regarding the

import of ¶ 69 in any attempt to utilize Dr. Steckel's Economic Values as a base for calculating

price:

Q: Did Dr. Steckel – did you tell Dr. Steckel how you were going to use his numbers?

A: I'll point you to the specific passage [in ¶ 69] that I think is germane here, because I had a specific question of him. "Price is primarily determined by three

16

factors," do you see that?

Q: Um-hum.

A: "Consumer value, producer costs, and competition. I studied only one, consumer value. By definition, consumer value is greater than or equal to price."

The reason I wanted to talk to him about that is that he was not suggesting that you couldn't use consumer value as an indicator of what price would be. He was simply saying you had to put in other factors to make a calculation based on that.

The two other factors that he pointed to, which were producer costs and competition are, of course, something that anybody putting forth an opinion on economics would have to include. You can't simply point at consumer value and say that's where the price falls, and everybody that looks at conjoint that has any sophistication whatsoever knows that those raw outputs on their own consumer value cannot be used that way.

Q: So how did you in your analysis take into consideration the other two factors besides consumer value; namely producer costs and competition?

A: Well, you may remember our discussion a few minutes ago about I wanted to confirm how Garmin calculated its margins, and its royalty spreadsheets, what its margin targets might be. That has to do with their producer costs and what their profit targets would be. That is where I wanted to impose the discipline, if you will, of margins and costs to any calculation of what a royalty might be. That would be reasonable in the eyes of both Garmin and Visteon when a hypothetical negotiation would take place.

*          *          *

Q: So did you use any adjustments to account for producer costs and competition?

A: You may recall that I went through an extensive analysis of Georgia Pacific factors, which in fact are designed to provide exactly that information. That's their purpose is to make sure that the entire spectrum of considerations would be laid forth.

With respect to producer costs, fortunately we have quite a bit of data on what Garmin's costs are. So I was able to see not only what their prices were, of course, but what their costs were and the consequent margins that allows me to take account of that.

*          *          *

17

Q: What did Dr. Steckel confirm for you?

A: He, being Joel Steckel, he said words, what he said to me was of course you can get a price indicia, that is to say, what is likely to be chargeable for features like this, by beginning with the consumer value, but you have to lay in producer costs, what does it cost to produce that feature and competition, how much can you charge without putting yourself in a position of being price differentiated in a negative way, that is to say, you charge more for a particular feature than somebody else does. You're likely to suffer the consequences, even if the consumer already values it at that larger number.

Q: Did Dr. Steckel provide any suggestion for how to incorporate producer costs and competition?

A: Nope.

Q: You determined that on your own?

A: Yes, he would have been way out of bounds telling me that.

Smith Dep. 61:12-62:25, 63:19-65:8 (quotation marks added).

From his conversations with Dr. Steckel, Mr. Smith confirmed that "you can't use the consumer value on its own to determine what somebody should charge for it, other than to say it should definitely be less than that."  Smith Dep. 67:21-24.  In determining how much was "less" in this case, Mr. Smith suggests that he attempted to determine producer costs and competitive market conditions and to apply those factors to the Economic Values to arrive at the missing "price indicia."

Mr. Smith's original calculations for a reasonable royalty using the Steckel Economic Values is set forth in Exhibit 19 of Mr. Smith's original Report.  (ECF No. 268, Ex. M, Peter Smith 9/28/12 Expert Report ("Original Smith Report"), Exhibit 19 "Reasonable Royalty Estimated Using Steckel Part-Worths and Gross Margin Target for Features").  With reference to this Exhibit 19, Mr. Smith explains that he calculated an ultimate royalty of $4.94 per unit (unit = an accused PND device) by "multiply[ing] Economic Values times a Target Margin times a *Georgia-Pacific* factor."  *Daubert*

Tr. 63:3-64:10 (alterations added). Taking the example of Mr. Smith's calculation for the '408 patent on Exhibit 19, Smith takes Steckel's Economic Value for the '408 ($13.29), applies to that "utility value" the profit margin of .715 that he calculates Garmin would want to make on something that it sold for that amount ($9.502) subtracts that "profit" from the "utility value" of $13.29, which yields the "Garmin threshold" royalty number of $3.78 ($13.29 x .715 = $9.502 and $13.29 - $9.502 = $3.78). Original Smith Report Ex. 19, p. 78. Mr. Smith then adds a discount of 40% (2.00/5.00 or .40 based on his analysis of the *Georgia Pacific* factors that "slightly favors" Garmin) to account for Garmin's market power/negotiating strength (his definition of the factor of "competition"), to arrive at a figure of $1.5149 as the adjusted reasonable royalty figure for the '408 patent ($3.78 x .40 = $1.5149). *Id.* Mr. Smith follows this same calculation for each of Steckel's Utility Values (aka Economic Values) to arrive at a total Royalty Per Unit figure for the four patents in suit of $4.94/Unit. Mr. Smith then multiplies the Royalty/Unit figure of $4.9415 by the number of units (accused devices) sold in 2009-2011 to arrive at a total damage figure of $85,929,392.63.

The "Notes" on Mr. Smith's Exhibit 19 explain that his 71.50% "Desired Margin" (referred to in his footnote as a "Target Margin") was "for features based upon actual gross margins for Garmin automotive PNDs 2009-2011." (Exhibit 19, Note 1.) Mr. Smith's work reveals that he used the following formula, utilizing the Estimated Hardware Cost and Mapping Software data set forth on the bottom of Exhibit 19, to calculate the 71.50%:

$$\text{Margin}_{total} = X_{HW} \cdot \text{Margin}_{HW} + X_{RY} \cdot \text{Margin}_{RY}$$

Margin$_{total}$ is Garmin's overall average profit margin (63.89% from 2009-2011). $X_{HW}$ and $X_{RY}$ are the relative proportions of hardware and royalty costs in Garmin's accused products, as estimated by Mr. Smith on the bottom of Exhibit 19 to be 0.66 and 0.34 respectively. Mr. Smith assumed a

constant hardware margin (Margin$_{HW}$) of 60% as reflected on the bottom of Exhibit 19.  Mr. Smith

then used the above formula to determine a royalty margin (Margin$_{RY}$) necessary to achieve a total

margin (Margin$_{total}$) of 63.89%.  The calculation yielded a royalty margin (Margin$_{RY}$) of 71.50% (i.e.

solving for x: (1).6389 = .396 + .34x; (2) .6389 - .396 = .2429; and (3) .2429/.34 = 71.44%).  Smith

Original Report at 78.[7]  Mr. Smith then used the 71.50% as his "Desired Margin" for purposes of

the calculations set forth on Exhibit 19.

 Subsequently, Mr. Smith submitted a supplemental report which changed some values that

he had utilized on Exhibit 19, including: (1) adjustments to Dr. Steckel's Economic Values, which

had increased after Mr. Smith issued his original Report based on some additional/corrective work

performed by Dr. Steckel;  and (2) utilization of the single-year gross margin for 2009 rather than

the average gross margin figure for 2009-2011that Mr. Smith had utilized in preparing Exhibit 19.

ECF No. 268, Ex. O, Peter Smith 12/20/12 Report, ("Smith Supp. Report"), Ex. 4; *Daubert* Tr.

52:18-54:3; 75:24-78:4.[8]  Mr. Smith's revised Exhibit 4 is entitled "Revised Calculations "Steckel

---

[7]  While Mr. Smith's Original Report does not lay out his calculation in precisely these terms,
Garmin's damages expert, Michael Newell, reconstructed Mr. Smith's calculation in this format,
which Garmin set forth in its motion to exclude Smith's opinions and testimony.  *See* ECF No. 260,
Garmin's Br. 20; ECF No. 268-19, Ex. S, 6/25/25 Declaration of Michael C. Newell ¶¶ 9-10.
Visteon did not challenge this interpretation of Mr. Smith's work in its Response to Garmin's
motion.  The Court has no reason to doubt the reliability of Mr. Newell's translation of Mr. Smith's
work into this formula and further finds that it represents Mr. Smith's work up to that point in a
manner that is consistent with Mr. Smith's deposition testimony and his testimony at the *Daubert*
hearing.

[8]Garmin has validly noted certain discrepancies between Mr. Smith's calculations on Exhibit 19 and
his revised calculations on Exhibit 4.  In particular, Mr. Smith has never fully explained how he
arrived at his revised "Desired Margin" of 76.65%.  As Mr. Newell points out, if we substitute the
revised single-year 2009 profit margin as used in Exhibit 4 for the 2009-2011 average used in
Exhibit 4, i.e. changing the actual profit margin from 63.89% to 64.06%, but apply the same
methodology for finding the "desired margin," the result is a very small change in the "desired
margin," i.e. from 71.5% to 72.0%, and not to the "desired margin" of 76.65% reflected on Exhibit

Part-Worths" Reasonable Royalty Estimate."   Exhibit 19 was entitled "Reasonable Royalty Estimated Using Steckel Part-Worths and Gross Margin Target for Features."   Comparing Exhibit 19 and Exhibit 4 on their face it appears that, although some of the values have changed, the two Exhibits calculate a royalty based on the same methodology, i.e. "Utility Value" times "Desired Margin" times ".40 *Georgia-Pacific*" factor.   The Exhibits contain the same five explanatory footnotes but Exhibit 4 does not depict the estimated hardware and software/licensing costs that appeared on Exhibit 19 and that apparently were the basis for Mr. Smith's "Desired Margin" calculation in Exhibit 19.

Visteon utilized Exhibit 4 as a demonstrative at the *Daubert* hearing to take the Court through Mr. Smith's revised calculation of a total reasonable royalty of $82,434,968.18.  *Daubert* Tr. 54:14-24.  Mr. Smith testified that his calculations on Exhibit 4 factored in Garmin average selling price for the accused devices, and Garmin's costs to produce the accused devices, but average selling price is not depicted as an input on either Exhibit 19 or Exhibit 4.  *Daubert* Tr. 54:21-55:21; 78:17-79:2.  When questioned by counsel for Garmin about how he calculated his new "desired margin"of 76.65% on Exhibit 4, an increase from the "desired margin" of 71.50% on Exhibit 19, Mr. Smith explained that he "used a different technique."  *Daubert* Tr. 82:25-83:6.

At the *Daubert* hearing, Mr. Smith attempted to explain a "different equation" that he employed to arrive at his suggested Royalty Per Unit of $4.7334/unit for the four patented features as set forth in revised Exhibit 4, an equation that Mr. Smith had previously discussed at his January

---

4.  While this is certainly a troubling discrepancy that Mr. Smith never satisfactorily explains, and while it would cause the Court concern regarding the soundness of Mr. Smith's methodology, the Court need not resolve this inconsistency because it finds, as discussed *infra*, that Mr. Smith's opinions and testimony must be excluded for the more fundamental reason that he utterly fails to apportion damages to the incremental value of the four patented features.

29, 2013 Deposition.  *Daubert* Tr. 79:3-11.  Mr. Smith had some measure of difficulty articulating

this methodology, but it appears that he endeavored to answer the following question:  In 2009, what

could Garmin add to their costs in the form of additional royalties at their 2009 sales price and still

maintain their overall profit margin of 64.06%?  Costs, margins and sales price utilized in the

calculation were based on Garmin data relating to the entire PND device:

$$\frac{\$35.62(\text{Garmin's hardware costs}) + \$18.20\ (\text{Garmin's royalty costs}) + x}{\$162.83\ (2009\ \text{Avg. Sales Price})} = 1 - (.6406)\ (2009\ \text{GM})$$

*Daubert* Tr. 54:21-57:24; 79:12-82:12; ECF No. 377, Garmin's Post-*Daubert* Brief Ex. A.  *See also*

ECF No. 268, Ex. N, 1/29/13 Smith Dep. 318:10-350:14, Ex. 14.  Solving for x yielded a figure of

$4.7334, the same value Mr. Smith arrived at as his Royalty Per Unit figure on Exhibit 4 using the

Steckel Utility Values. Mr. Smith conceded at the *Daubert* hearing that Dr. Steckel's Economic

Values do not figure anywhere into this "different calculation" based on Garmin's acutal selling

price, costs and margins, which nonetheless arrives at the same Royalty Per Unit figure ($4.7334)

as his "Revised Calculations" on Exhibit 4 utilizing Dr. Steckel's Economic Values.  *Daubert* Tr.

82:10-15.  Mr. Smith then uses the $4.7334 Royalty Per Unit figure to calculate a revised damage

figure for the four patents in suit of $82,434,968.18, a slight decrease from the $85,929,392.63

calculated on Exhibit 19.  Smith Supp. Report Ex. 4.

Mr. Smith conceded that none of his calculations undertook to determine the price that

consumers would pay for the individual technology provided by the infringing features:

Q: Did you determine the portion of the price that consumers would pay for the
infringing features?

A: No.

Q: Did you find the portion of Garmin's revenue from selling these products that
you've looked at that was attributable to the patented features?

A: Not directly.

Q: Do you have any way to quantify the portion of Garmin's revenue from the accused products that is attributable to the patented features?

A: Yes.  In fact, the approach I took called Target Margin and modified in some respects, but the approach I took was intended to show that A., Garmin would pay as little as possible for that which has been my experience every patent negotiation I've ever been involved in  – as little as possible.  The same thing as a consumer would say if you offer me a $5000 computer for 2000 and the same computer with the same features for 1000, I will inevitably pick the $1000 one.  I say yes, I've got that part.  So I did calculate this by saying that based upon their existing price at that – this notion $162-plus and based upon their gross margin because I'm not really sure what margin meant in those data, but based upon that margin which is 64%, Garmin would not pay more for the functionality in the patents than would be required to maintain their margins and maintain their price.

*Daubert* Tr. 70:17-71:11.

To arrive at his calculation of the 40% "competition" discount that he applied to his "Garmin Threshold Margin" on Exhibits 19 and 4, Smith considered Garmin's significant market power and many of the *Georgia Pacific* factors that have been acknowledged as meaningful indicia of how parties would behave in a hypothetical negotiation.  In his deposition, Mr. Smith defended his methodology for arriving at the values set forth on Exhibit 19 of his Report:

A: I say look, we got to keep in mind that Garmin has the whip hand here.  We think we have something to sell that is of value.  We're negotiating with them on what they're going to pay for it.  That's what this entire negotiation is for.  We want to give you – sell you something of value.  We have to establish a price.  We, however, are Visteon, and we have no ability to help you in the marketplace.  We have limited experience with pushing this stuff out and developing new features.  There's an expiring patent life.  All of the Georgia Pacific factors that we've mentioned in the past that I say add up to another discount factor, so I take not only that threshold number, what they could pay [and still retain their .715 profit margin], but I discount that still further by 40 percent.  That comes up with the 4.9415.  Then having done that, by allocation, the adjusted value is each one of these on the far right.

So you have an adjustment for the necessary margin to sustain their average margin, and then you have a negotiating factor applied to that.  That says based on the royalty strength of the two parties, the most you could expect Garmin to be

willing to pay, assuming these were factually the case and that everybody came with perfect information to the negotiation, the most you could expect Garmin to be willing to pay would be just under $5. Would we start there? Obviously, I don't know. But I know what I would do in preparation for a negotiation. I would do exactly this analysis, and I would be sensitive to the threshold numbers that Garmin was working with. I would be sensitive to the fact that they are a very powerful factor in the marketplace. I would be sensitive to the fact that they bring lots of stuff to bear that we can't give them and therefore can't expect to get value for it.

So I've heavy (sic) discounted the threshold value down to something I think is much more likely to be where you'd end up. That's the nature of the negotiation. It carries out a margin expectation, which is the obverse of cost. Dr. Steckel's second admonition: You got to pay attention to what product costs, right? Then it takes competitive factors and negotiating power of the entity that you're talking to and it says, okay, let's take a look at that and adjust for those factors as well . . . . That's why I selected [$4.94], because it is based on objective evidence, it has the characteristics of paying attention to Garmin's profitability, paying attention to Garmin's market power, paying attention to all the other factors that bear through the Georgia Pacific factors on a negotiation.

Smith Dep. 144:6-145:25, 146:23-147:4.

Mr. Smith testified at the *Daubert* hearing that he considered each of the *Georgia-Pacific* factors as set forth in Exhibits 10 and 11 of his original Report and came up with the .40 discount factor that he applied in Exhibits 19 and 4. *Daubert* Tr. 49:16-51:12. Mr. Smith testified that the *Georgia-Pacific* factors "in part" account for competition but testified that he could not quantify the impact of competition Dr. Steckel's economic values, *Daubert* Tr. 72:21-73:5, and conceded that the *Georgia-Pacific* factors could not be applied directly to convert Dr. Steckel's economic values into a price that consumers would pay for the infringing features. *Daubert* Tr. 74:6-22.

## II.    LEGAL STANDARD

"Admissibility of expert testimony is governed by Federal Rule of Evidence 702 and informed by the seminal case applying Rule 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)." *In re Southeastern Milk Antitrust*

24

*Litigation*, 739 F.3d 262, 267 (6th Cir. 2014).   Fed. R. Evid. 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"[T]he rules of evidence - especially Rule 702 - do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993).  The trial court's "gatekeeping" task with respect to expert testimony applies not just to scientific evidence, as was at issue in *Daubert*, but to all types of specialized knowledge presented through an expert witness. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148-49 (1999).  ""[T]he relevant reliability concern may focus upon personal knowledge or experience . . . [as] there are many different kinds of experts, and many different kinds of expertise." *Id.* at 150.  The Court must analyze separately the proposed expert's qualification, reliability and helpfulness.

The Federal Circuit "appl[ies] regional circuit law to evidentiary issues." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1324 (Fed. Cir. 2014).  "Whether proffered evidence should be admitted in a trial is a procedural issue not unique to patent law, and therefore we review the district court's decision whether to admit expert testimony under the law of the regional circuit, here the Fifth Circuit." *Micro Chem., Inc. v. Lextron*, 317 F.3d 1387, 1390-91 (Fed Cir. 2003).  The Sixth

Circuit has noted that absolute certainty is not required of an expert but that sheer speculation, regardless of the qualifications of the speculator, lacks sufficient reliability:

> Rule 702, we recognize, does not require anything approaching absolute certainty. *See Daubert*, 509 U.S. at 590, 113 S.Ct. 2786. And where one person sees speculation, we acknowledge, another may see knowledge, which is why the district court enjoys broad discretion over where to draw the line.

*Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671-72 (6th Cir. 2010).

To determine the testimony's reliability, the court does not "determine whether [the opinion] is correct, but rather [determines] whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529–30 (6th Cir. 2008). "As gatekeeper, the trial court only determines the admissibility of expert evidence; the jury determines its weight. The court's focus is 'solely on principles and methodology, not on the conclusions that they generate.'" *United States v. Stafford*, 721 F.3d 380, 393-94 (6th Cir. 2013) (quoting *Daubert*, 509 U.S. at 595) (alterations in original). "[R]ejection of expert testimony is the exception, rather than the rule." *In re Scrap Metal*, 527 F.3d at 530.

## III.  ANALYSIS

Garmin asserts that if the Court determines that Mr. Smith's opinions and testimony are inadmissible under *Daubert*, the Court must exclude the testimony and results of Dr. Steckel's conjoint study, which have no relevance other than their utilization by Mr. Smith.  Visteon concedes this point in its post-*Daubert* hearing brief when it states that "Mr. Smith's Lane Guidance and Turn Preview analysis, Total Available Margin analysis, and MITAC analysis do not rely on Dr. Steckel's conjoint study and are thus unaffected by Garmin's MIL No. 1 directed to Dr. Steckel's conjoint

study."[9]  ECF No. 386, Visteon's Post-*Daubert* Br. 5 n. 3.  Because the Court concludes, for the reasons discussed below, that Mr. Smith's opinion and testimony setting forth his second damage methodology that relies on the results of Dr. Steckel's conjoint study is inadmissible, the Court will exclude Dr. Steckel's conjoint study and testimony completely for a lack of relevance to the facts of the case based on Visteon's concession that Dr. Steckel's conjoint study is unrelated to his other damage methodologies.

### A.    The Apportionment Requirement

In a line of cases as far back as 2009, the Federal Circuit has continued to reinforce the requirement that infringement damages must be apportioned in relation to the patented features alone, separate and apart from any value attributable to any unpatented features.  *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1337 (Fed. Cir. 2009) ("'if plaintiff's patent only created part of the profits, he is only entitled to recover that part of the net gains'") (quoting *Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co.*, 225 U.S. 604, 614-15 (1912)); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67-68 (Fed. Cir. 2012) ("[I]n any case involving multi-component products, patentees may not calculate damages based on sales of the entire product,

---

[9] With regard to his "third methodology," the "Target Margin" approach, Mr. Smith testified that the proportional values set forth on Exhibit 1 of his original report, allocating 10% of the feature value to hardware, 55% to mapping software and other licenses, and the remaining 35% to the four features in suit was "arbitrarily" decided. Ex. D, Smith 11/13/12 Dep. 165. As Mr. Smith admitted in his deposition, his "apportionment" of 35% of the value of the PNDs to the four asserted patented features was completely arbitrary and lacked evidentiary support.  ECF No. 268, Ex. D, Smith 11/13/12 Dep. 165-67.  In fact, in his deposition, Mr. Smith testified that he decided not to rely on this "third methodology," which "simply by happenstance" yielded an $85 million damage figure similar to the Steckel part worth damage figure of $85 million, specifically because he "didn't have data or evidence to rely on for [his] 35% number."  *Id.* at 166-67.  Thus, as Mr. Smith himself acknowledged, this damages method lacks sufficient scientific reliability and will be excluded along with Mr. Smith's second damage methodology that relies on the Steckel conjoint study.

as opposed to the smallest salable patent-practicing unit, without showing that the demand for the entire product is attributable to the patented feature.").  The patentee must, in every such case, "give evidence tending to separate or apportion the infringer's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative."  *Garretson v. Clark*, 111 U.S. 120, 121 (1884) (internal quotation marks omitted).  "When the accused infringing products have both patented and unpatented features, measuring this value requires a determination of the value added by such features. . . . [A] jury must ultimately 'apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features' using 'reliable and tangible' evidence."  *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) (quoting *Garretson*, 111 U.S. at 121) (alteration added).   "No matter the form of the royalty, a patentee must take care to seek only those damages attributable to the infringing features.  Indeed . . . a patentee 'must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible.'")  *VirnetX*, 767 F.3d at 1326 (quoting *Garretson*, 111 U.S. at 121).  "[W]hen claims are drawn to an individual component of a multi-component product, it is the exception, not the rule, that damages may be based upon the value of the multi-component product."  *Id.* (citing *LaserDynamics*, 694 F.3d at 67-68)  The exception that does not require such disaggregation, i.e. the circumstance in which it is appropriate to calculate damages based on the entire market value of the accused product, requires evidence that "the patented feature creates the basis for customer demand or substantially creates the value of the component parts."  *Id.*  (internal quotation marks and citation omitted).  There is no claim that the entire market value rule ("EMVR") applies here

and Visteon is thus required disaggregate the patented from the unpatented features and "to apportion value between the patented features and the vast number of non-patented features contained in the accused product." *Id*. at 1329.

**B.    Neither Dr. Steckel Nor Mr. Smith Has Employed a Methodology That Properly Apportions Damages to the Patented Features**

Mr. Smith confirmed in his deposition his understanding that Dr. Steckel calculated the consumer value only of the accused features and did not undertake to determine the value of all features of the accused devices, including a multitude of features not being challenged in this case:

> Q: Did Dr. Steckel calculate the total consumer value of all features of personal navigation devices?
>
> A: I believe he only talked about the patented features in his calculations; and again, in paragraph 69, that is indicated directly.
>
> Q: Okay.  So is that correct then, Dr. Steckel did not calculate the total consumer value of all features, including non patented features of personal navigation devices?
>
> A: To my knowledge, he didn't and certainly his report doesn't say that.
>
> *         *         *
>
> Q: [B]ut Dr. Steckel did not determine a parts-worths (sic) value for all of the non-patented features and functionalities in the PNDS?
>
> A: That was not the objective of his study, so I'm fairly certain he didn't.

Smith Dep. 65:9-25, 167:8-12.  While Mr. Smith may have "picked up where Dr. Steckel left off," as Visteon represented he would do, he too failed to properly demonstrate apportionment.

Mr. Smith's original Report states that "the entire market rule does not apply in this case," and therefore he is not using Garmin's sales revenue as "an appropriate royalty base for purposes of the damages calculation."  ECF No. 268, Ex. M, Original Smith Report at 29.    Instead, Mr. Smith states, he "believes that some measure of the available margin to pay royalties should be

used." *Id*.  Mr. Smith "decided to use reported gross margin after accounting for current royalty payments to existing licensors for Garmin PND features as the initial basis for calculation."  *Id*.

Testifying at the *Daubert* hearing, as set forth *supra*, Mr. Smith admitted that he did not determine the price that consumers would pay for the infringing features and did not find the portion of Garmin's revenue from selling the accused devices that was attributable to the patented features. *Daubert* Tr. 70:17-71:11.  Mr. Smith explained that his effort to quantify the portion of Garmin's revenue that was attributable to the infringing features can be seen in his calculations set forth on Exhibit 4 of his Second Supplemental Report, discussed in detail *supra*, in which he demonstrates that Garmin would pay no more for the patented features than their target margin would allow. Whatever the economic or mathematical soundness of Mr. Smith's calculation, it fails to demonstrate apportionment as required under Federal Circuit law.  Mr. Smith's work assumes that Visteon would be entitled to the full additional marginal royalty amount ($4.73/unit) that Garmin would be willing to pay while still maintaining its sales price and margins.  His original calculation (at least as originally set forth on Exhibit 19 and depicted on Exhibit 4) was premised on the Steckel economic utility values which, despite Visteon's assertion otherwise, Mr. Smith *does* effectively treat as the starting price to which he applies a "desired margin" calculated with reference to Garmin's actual margins and from which he derives his Royalty Per Unit figure.

Mr. Smith makes no attempt to quantify the value of the four patented features, which are but a few of the numerous features that drive consumer demand for the accused devices, relative to those other features.  At the *Daubert* hearing, the Court asked Mr. Smith whether his work assumed that one hundred percent of the value of the accused devices's features was attributable to the four accused patented features, Mr. Smith replied:

A: No I did not assume that.

Q: What did you factor in?

A: I assumed that there was value provided by the patents for sure.  I assumed that because of the Study that was done by Dr. Steckel which showed that there was utility value of some size.  I also know from study at least until 2014, that none of the features embodied in the patents were substituted for by Garmin.  They kept all of those functionalities and did not design – even though they claimed they could – did not design a noninfringing substitute.  So I have to judge from that that Garmin believed those patents had substantial value, but not all of the value.

*Daubert* Tr. 58:24-59:12.  "The Federal Circuit is clear that a patentee's evidence 'to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features . . . must be reliable and tangible, . . . not conjectural or speculative.'" *GoDaddy.com LLC v. Rpost Commun. Ltd.,* No 14-00126, 2016 WL 2643003, at *6 (D. Ariz. May 10, 2016) (quoting *LaserDynamics*, 694 F.3d at 67-68 (citing *Garretson*, 111 U.S. at 121) (ellipsis in orignal).  "[Q]ualitative testimony that an invention is valuable – without being anchored to a quantitative market valuation – is insufficiently reliable."  *Commonwealth Scientific and Industrial Research Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1302 (Fed. Cir. 2015).  Mr. Smith's conclusion, drawn from Dr. Steckel's study that admittedly failed to apportion value, that "there was utility value of some size" is exactly the type of speculative opinion, completely untethered from any quantitative market evidence, that fails to meet *Daubert* standards in this context.

Mr. Smith admits that he did not determine the actual value of the four patented features and did not compare the value of patented features to the value of the numerous non-accused features. His work contains no discussion whatsoever of the value of the many non-patented features of the accused devices that are not subject to Visteon claims and as to which Visteon has no right to royalty damages.  Indeed it appears irrelevant to Mr. Smith's "different calculation" explained at the

*Daubert* hearing whether there were four or ten patents accused – the marginal royalty that Garmin would allegedly be prepared to pay would be the same – divvied up differently but the same. Working from Garmin's actual costs and margins on its entire accused devices at the time of the hypothetical negotiation, Mr. Smith calculated a target margin that Visteon would seek to maintain and derived from that a residual amount that Garmin would have been willing to pay in 2009 in additional royalties. Mr. Smith then assumes, with no discussion of the value of these particular patented features or the numerous other valuable features of the accused devices and no attempt to quantify the increased profit that Garmin could have expected to earn from the technology represented by these specific four features, that Garmin would have paid this entire residual amount of profit margin to obtain a license to include these four features in its PNDs. Mr. Smith explained this step of his methodology at the *Daubert* hearing:

> [T]he approach I took called Target Margin and modified in some respects, but the approach I took was intended to show that A., Garmin would pay as little as possible for that which has been my experience every patent negotiation I've ever been involved in – as little as possible. . . . So I did calculate this by saying that based upon their existing price at that – this notion $162-plus and based upon their gross margin because I'm not really sure what margin meant in those data, but based upon that margin which is 64%, Garmin would not pay more for the functionality in the patents than would be required to maintain their margins and maintain their price.

ECF No. 386, *Daubert* Tr. 70:17-71:11.

Mr. Smith testified that Dr. Steckel's Utility Values "become the basis for apportioning the individual royalties to the individual patents. They are the apportionment mechanism created by the Conjoint Analysis." *Daubert* Tr. 56:24-57:13. This is not the "apportionment" required by Federal Circuit law. The fact that Mr. Smith at some point "divvies up" the $4.73 according to the proportions determined by Dr. Steckel's Utility Values, which we have already established failed to apportion value, does nothing to alter the fundamental failing to "link demand for the accused

device to the patented features, and [] to apportion value between the patented features and the vast number of non-patented features contained in the accused products." *VirnetX*, 767 F.3d at 1329. "Beginning from a fundamentally flawed premise and adjusting it based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusion." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011).

Without an understanding of how valuable the four patented features are to demand for the accused devices, *i.e.* without a calculation of the patented features' "footprint in the marketplace," *VirnetX*, 767 F.3d at 1326 (quotation marks omitted), it is impossible for a jury to determine the profit that could actually be attributed to Garmin's use of the patented features. *See GoDaddy.com*, 2016 WL 2643003, at *6 (excluding expert testimony that relied on "'vague qualitative notions of the relative importance' of the patented technology to assert that 10% of the accused products profits should be apportioned to the patented technology") (quoting *LaserDynamics*, 694 F.3d at 69); *Open Text, S.A. v. Box Inc.*, No. 13-04910, 2015 WL 349197, at *7 (N.D. Cal. Jan. 23, 2015) (excluding expert testimony for failure to "apportion down to the usage and importance of the accused features themselves"); *Intelligent Verification Sys., LLC v. Microsoft Corp.*, No. 12-525, 2015 WL 1518099, at *6-7 (E.D. Va. March 31, 2015) (excluding expert's testimony under the mandate of *VirnetX* for failure to apportion beyond comparing cost of hardware components necessary to practice the patented features to the total cost of the accused product, concluding that expert failed to identify the value of the individual patented feature).

"The essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *Ericsson*, 773 F.3d at 1226. In this case, neither Dr. Steckel nor Mr. Smith has provided a basis for the jury to determine

the incremental value that these four patented features added to the accused products.  Mr. Smith's work gives no evidence of how Garmin's profits would have increased at the time of the hypothetical negotiation from incorporating the patented features and therefore gives no evidence on which a jury could determine how much Garmin would actually have been willing to pay to obtain the functionality of *these* four features.

In its post-*Daubert* hearing briefing, Visteon only twice in passing mentions the apportionment issue, notwithstanding the fact that apportionment was extensively addressed with Mr. Smith by Garmin's counsel at the *Daubert* hearing.  First, Visteon suggests that Mr. Smith's *Georgia-Pacific* analysis "fully considered, *inter alia*, the relative positions of the parties and the value of the patented features to both consumers and Garmin.  As such, this approach appropriately and reliably apportioned the value attributable to the patented features."  ECF No. 376, Visteon's Supp. Br. 7.  "While factors 9 and 13 of the *Georgia–Pacific* factors allude to apportionment concepts," *Ericsson*, 773 F.3d at 1228 n. 5, "[i]t is not enough to merely show that the [patented feature] is viewed as valuable, important, or even essential" to use of the device in which it is incorporated.  *LaserDynamics*, 694 F.3d at 68.  Mr. Smith's analysis of *Georgia-Pacific* factors 9 and 13 falls far short of the apportionment required by the Federal Circuit.  Analyzing factor 9, Mr. Smith states in full:

> The deployment and use of the asserted patents in the accused products has become ubiquitous in the PND market, demonstrating that the functionality provided is extremely valuable.  The fact that none of the major competitors has successfully attempted or introduced workaround is an indication that it would be difficult to provide the same functionality, in spite of the fact that the patents-in-suit clearly provide a valuable functionality that is now a design standard in the industry.

ECF No. 268, Ex. M, Original Smith Report 64.  Opining in a conclusory fashion that the features are "extremely valuable" and have "become ubiquitous" says nothing substantive about their value

and/or about their value vis-a-vis the many other "extremely valuable" features and certainly does not establish their "incremental value" for purposes of apportioning damages.

*Georgia-Pacific* factor 13, which examines "the portion of realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer is actually non-existent," is likely the most pertinent factor for assessing the issue of apportionment. Although Mr. Smith assigns factor 13 a score of 3, he provides no analysis whatsoever for that conclusion. Original Smith Report at 64. Thus, while it is possible that in certain instances a thorough fact-based analysis of these *Georgia-Pacific* factors could tend to support an apportionment analysis, Mr. Smith's analysis of those factors in this case does not approach "the substantive statutory requirement of apportionment of royalty damages to the invention's value." *Ericsson*, 773 F.3d at 1226. Mr. Smith's *Georgia-Pacific* analysis, contrary to Visteon's claim otherwise, *did not* "appropriately and reliably apportion[] the value attributable to the patented features." ECF No. 386, Visteon's Supp. Br. 7.

Visteon's second passing reference to the apportionment issue fares no better. Visteon states that "contrary to Garmin's allegations, the per device royalty calculation did not assume that a hundred percent of the value of the PND's features were attributable to the four accused features." Visteon's Supp. Br. 8. In support of this statement, Visteon cites Mr. Smith's response to the Court's questioning cited *supra*, that was directed to this issue. As discussed *supra*, Mr. Smith's explanation to the Court as to how he determined what portion of the value of the PND's features *was* attributable to the four patented features falls far short of the apportionment analysis required by Federal Circuit law, i.e. he simply "assumed there was value provided by the patents for sure"

based on Dr. Steckel's study and concluded that because Garmin kept the features in their devices "Garmin believed those patents had substantial value, but not all of the value" of the accused devices. *Daubert* Tr. 58:24-59:12. This was the entirety of his analysis directed to apportioning the value of the patented features relative to the value of the numerous other features of Garmin's PNDs. "Such conclusory assertions cannot form the basis of a jury's verdict." *VirnetX*, 767 F.3d at 1333.

Visteon then goes on in its post-hearing brief to confusingly refer to Mr. Smith's "dividing up" his royalty margin among the four patents in suit according to Dr. Steckel's Utility Values as "relative apportionment" or "the proportional distribution of the per device royalty to the asserted patents." Visteon's Supp. Br. 9 (emphasizing that "the Utility Values were *only* used for *relative* apportionment") (emphasis in original). As discussed *supra*, this is not the "apportionment" required under Federal Circuit precedent and Visteon's use of the term in this context is unfortunate at best and misleading at worst.

In the end, the patentee "must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative; or he must show, by equally reliable and satisfactory evidence, that the profits and damages are to be calculated on the whole machine, for the reason that the entire value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature." *Garretson*, 111 U.S. at 121 (internal quotation marks and citation omitted). The EMVR does not apply here and Mr. Smith failed to provide reliable and tangible evidence that would permit a jury to determine what portion of Garmin's profits could be attributed to the incremental value that the four patented features added to the overall value of the accused devices. *Ericsson*, 773 F.3d at 1229. It was

Visteon's burden to demonstrate this critical aspect of their damage calculation in a solid, factually-supported, understandable way. Although Garmin vigorously attacked Mr. Smith on this fundamental flaw in both its briefing and at the *Daubert* hearing, Visteon has not offered a cogent explanation of how Mr. Smith separated the value of the numerous valuable non-patented features from that of the four patented features asserted in this case. "In calculating the royalty base, [Mr. Smith] did not even try to link demand for the accused device to the patented feature, and failed to apportion value between the patented features and the vast number of non-patented features contained in the accused products. Because [Mr. Smith] did not 'carefully tie proof of damages to the claimed invention's footprint in the market place,' *Uniloc*, 632 F.3d at 1317 (quoting *ResQNet*, 594 F.3d at 869), his testimony on the royalty base under this approach [is] inadmissible and [is] excluded." *Virnet X*, 767 F.3d 1329 (alterations added). "While questions regarding which facts are most relevant for calculating a reasonable royalty are properly left to the jury, a critical prerequisite is that the underlying methodology be sound." *Id.* at 1328. Mr. Smith's failure to apportion is a failure of sound methodology and his opinion setting forth a damage model based upon the Steckel Economic Values (Mr. Smith's preferred "second method") will be excluded.

## IV.  CONCLUSION

For the foregoing reasons, the Court GRANTS Garmin's Motion to Exclude Dr. Joel Steckel's Conjoint Survey and Conclusions Derived Therefrom (ECF No. 269) and GRANTS Garmin's Motion to Exclude Peter Smith's Reasonable Royalty Calculations and Opinions Regarding Damages (ECF No. 260). The Court also GRANTS Garmin's Motion to Strike Dr. Steckel's Declaration (ECF No. 318), Garmin's Motion to Strike Portions of Peter Smith's Expert Report (ECF No. 342), and Visteon's *Daubert* Motion to Exclude John Lavrakas From Offering any

Testimony Rebutting Survey Evidence (ECF No. 255).[10]

IT IS SO ORDERED.


s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: October 14, 2016

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 14, 2016.


s/Deborah Tofil
Case Manager

---

[10]   Each of these motions, (ECF Nos. 318, 342 and 255) is GRANTED in light of the Court's exclusion of Dr. Steckel's conjoint study and expert opinion and the exclusion of Mr. Smith's expert opinion and testimony that relies on the results of Dr. Steckel's conjoint study.  In ECF No. 318, Garmin moves to strike Dr. Steckel's Declaration in which he attempts to opine on the propriety of Mr. Smith's analysis.  In ECF No. 342, portions of which the Court resolved in a separate Opinion and Order entered on May 23, 2016, Garmin seeks to exclude Mr. Smith's supplemental opinions, also based in part on Dr. Steckel's conjoint analysis, regarding the value of claims 4 and 5 of the '408 patent in light of the cancellation of claim 1 of the '408 patent.  In ECF No. 255, Visteon seeks to exclude expert testimony of Garmin's expert John Lavrakas opining as to the validity of the design of Dr. Steckel's conjoint study.